**UNITED STATES of America, Plaintiff,**

v.

**All Monies and Other Property Contained in Any and All Accounts and Certificates in the Names of BANCO CAFETERO INTERNATIONAL, Banco Cafetero Panama, Banco Cafetero Panama 9A, Banco Cafetero Bogota, Banco Cafetero Colon, Banco Cafetero Caribe Ltd., including But Not Limited to Checking Account Nos. 8033066547, 8033269898, and 8026003335, up to the amount of $31,000,000 United States Currency and All Monies and other Property Contained in checking account no. 8033270500, up to an Unlimited Amount of United States Currency, Maintained At Various Branches of Irving Trust Company, Defendants-in-rem.**

**UNITED STATES of America, Plaintiff,**

v.

**ACCOUNT NO. 000400054817 AT CHEMICAL BANK, Defendant-in-rem.**

**UNITED STATES of America, Plaintiff,**

v.

**ACCOUNT NO. 000019236021 AT PHILADELPHIA INTERNATIONAL BANK, Defendant-in-rem.**

**UNITED STATES of America, Plaintiff,**

v.

**ACCOUNT NO. 000000030465 AT MARINE MIDLAND BANK NA, Defendant-in-rem.**

---

UNITED STATES of America, Plaintiff,
v.

ACCOUNT NO. 000001011892 AT FIRST CHICAGO INTERNATIONAL BANKING CO., Defendant-in-rem.

Nos. 85 Civ. 1835 (GLG) to 85 Civ. 1837 (GLG), 85 Civ. 1840 (GLG), 85 Civ. 1841 (GLG).

United States District Court, S.D. New York.

May 6, 1985.

Rudolph W. Giuliani, U.S. Atty. for the S.D.N.Y., New York City, for plaintiff; Robert L. Ullmann, Cynthia Keeffe, Sp. Asst. U.S. Attys., Franklin H. Stone, Asst. U.S. Atty., New York City, of counsel.

Kelley Drye & Warren, New York City, for claimants; Scott G. Campbell, Arnold S. Klein, Tomas T. Szoboszlai, New York City, of counsel.

## OPINION

GOETTEL, District Judge.

This action arises out of the government's attempt to prevent laundering of money from illegal narcotics transactions. On March 8, 1985, the United States filed eight complaints in forfeiture against moneys located in various bank accounts in New York City. The government then applied for and obtained warrants for arrest of the defendants-in-rem, which were served upon the custodial banks.

The defendants-in-rem are, mostly, moneys and other property in the accounts of Banco Cafetero International, Banco Cafetero Panama, Banco Cafetero Bogota, and Banco Cafetero Colon (collectively referred to as the "expropriated banks"), maintained at Irving Trust Company, Chemical Bank, First Chicago International Banking Co., Marine Midland Bank NA, and Philadelphia International Bank. On March 13, 1985, by an order to show cause, the expropriated banks moved to vacate the warrants of arrest pursuant to Rule 12 of the Admiralty and Maritime Claims Rules of the United States District Courts for the

Southern and Eastern Districts of New York. Rule 12 provides that,

> [w]here property is arrested or attached, any person claiming an interest in the property arrested or attached, may upon a showing of any improper practice or a manifest want of equity on the part of the plaintiff be entitled to an order requiring the plaintiff to show cause why the arrest or attachment should not be vacated or other relief granted consistent with these rules or the Supplemental Rules.

Rule 12. For the following reasons, we deny the expropriated banks' motion to vacate the warrants at this time.

## BACKGROUND

In their papers, the parties set forth the "facts" outlining the events and transactions at issue. In order to understand the events leading up to the instant controversy, we will set forth the claims, recognizing that many of the "facts" are in dispute, or, at least, are not conceded to be true.

On January 30, 1984, officers of the Burbank, California, Police Department discovered approximately $690,000 in United States currency in small denominations in the apartment of Franciso Arredando and Magley Belasic. They also discovered a bag containing torn-up cashier's check receipts totalling approximately $1,100,000 in United States currency. It was suspected that the inhabitants of the apartment were part of a large illegal narcotics money-laundering scheme. Therefore, federal agents commenced an investigation.

The investigation revealed that all of the checks were for amounts less than $10,000 and were purchased at various banks with cash, largely, if not entirely, in small bills. The investigation further revealed that these cashier checks had been deposited to an account in the name of the First Interamericas Bank of Panama, S.A. ("FIB"), maintained at the Continental National Bank of Miami, Florida ("CNB"). Handwriting analysis revealed that many of the endorsements on the checks were made by the same individual, even though the signatures were in different names.

Surveillance of CNB during March and April 1984, disclosed significant daily cash or cashier's check deposits into FIB's account. These were delivered by carriers unable to identify the individuals responsible for the deposits. From November 1984 to December 1984, $4,000,000 was deposited into FIB's account. An FIB account representative appeared at the time of the arrival to verify the count for deposit.

CNB advised federal agents that money had been removed from the FIB account either by cash withdrawals by authorized FIB representatives, all of whom were Colombian or Panamanian, or by wire transfers to banks in New York City. Most of the wire transfers went to Irving Trust Company, into the account of Banco Cafetero Panama, Account Number 803–3270–500 (the "500 account"). From March 1983 to the present, CNB records revealed that approximately $27 million had been wire transferred from the FIB account to the 500 account. This account, however, also received funds of other customers of Banco Cafetero Panama.

Investigations by federal agents also revealed that FIB moneys have continued to flow out of FIB's account at CNB and into accounts in New York. At least $1,200,000 was deposited into the 500 account at Irving Trust between February 1, 1985, and March 1, 1985.

An examination of the documents received by federal agents as of March 8, 1985, revealed that certain funds in the 500 account, attributable to FIB, were transferred to other Banco Cafetero Panama accounts maintained at Marine Midland, Chemical Bank, Philadelphia International Bank of New York, and First Chicago International Banking Co., and into accounts of Banco Cafetero Colon and Banco Cafetero International maintained at Irving Trust. In addition, numerous transfers occurred back and forth between Banco Cafetero Panamas's various accounts and the accounts of Banco Cafetero Bogota, Banco

Cafetero Colon, and Banco Cafetero International.

In or about March 1984, federal agents also learned through a review of CTR (IRS Form 4789) reports that large cash transactions were being deposited into an FIB account at Tower Bank in Hialeh Gardens, Florida ("Tower"). From March 1983 to the present, Irving Trust Company records show that approximately $4 million has been wire transferred from the FIB account at Tower to a Banco Cafetero account in New York.

The FIB headquarters in Panama is a small residential house with bars on the windows and a small sign. Its president, Gilbert Rodriguez, was indicted in Los Angeles in August 1982, for violation of the federal narcotics laws. He has also been indicted in the Eastern District of New York for violating narcotics laws. Based on these indictments, he was arrested in Madrid, Spain, and is currently facing extradition to the United States. FIB was recently nationalized by the Government of Panama, allegedly due to its well-known connection with narcotics operations.

Banco Cafetero Bogota is a banking corporation organized and existing under the laws of the Republic of Colombia with its head office in Bogota. It is the largest state-owned bank in Bogota, Colombia. The account it maintains with Irving Trust Company in New York is a demand or checking account. Banco Cafetero Panama is a banking corporation formed under the laws of Panama and is a wholly-owned subsidiary of Banco Cafetero Bogota. The accounts that it maintains at the various banks are demand accounts. Banco Cafetero Colon is a branch bank of Banco Cafetero Panama in Colon, Panama, and it maintains a demand account at Irving Trust. Banco Cafetero International is an Edge Act bank organized under the laws of the United States. Its main office is located in New York and it too is a wholly-owned subsidiary of Banco Cafetero Bogota. Likewise, its account at Irving Trust is a demand account.

On March 8, 1985, the government filed eight complaints in forfeiture against the eight bank accounts, alleging that the defendants-in-rem are subject to forfeiture pursuant to 21 U.S.C. § 881 because they were furnished or intended to be furnished in exchange for a controlled substance in violation of Title 21 of the United States Code, constitute proceeds traceable to an exchange of a controlled substance in violation of Title 21, and/or were used to facilitate a violation of Title 21.

The government obtained warrants for the arrest of the defendants-in-rem seeking to seize all of the moneys and property in the accounts. They subsequently amended the warrants so that they seized only moneys in the accounts attributable to FIB.[1]

The exact amount of moneys presently under seizure is unclear. According to the most recent papers submitted by the government, the following amounts are presently under arrest: $2,000,000 in Banco Cafetero Panama's account at Irving Trust; $2,552,000 in Banco Cafetero Panama's account at Marine Midland; $299,729.68 in Banco Cafetero Panama's account at First Chicago; $54,585 in Banco Cafetero Panama's account at Chemical Bank; and $323,000 in Banco Cafetero Colon's account at Irving Trust. Two other restrained accounts have a negative balance: Banco Cafetero Panama's account at Philadelphia National Bank and Banco Cafetero International's account at Irving Trust. The last account, Banco Cafetero Bogota's account at Irving Trust, was unrestrained upon the government's consent.

## DISCUSSION

The expropriated banks set forth several arguments to vacate the warrants of arrest. These arguments fall into four main categories: the inadequacy of the complaints; the failure to seize a forfeitable res; the failure to show probable cause; and the unconstitutional application of the seizure procedures. Although we will deal with each argument one at a time, we note that many of the issues are interrelated.

---

**1.** Throughout the opinion, we will refer to the amended warrants as the warrants and, where

necessary, we will distinguish between the original and amended warrants.

Section 881 of Title 21, which provides for the forfeiture of property connected to illicit drug traffic, states in relevant part as follows:

(a) The following shall be subject to forfeiture to the United States and no property right shall exist in them:

\* \* \* \* \* \*

(6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter, except that no property shall be forfeited under this paragraph, to the extent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.

(b) Any property subject to forfeiture to the United States under this subchapter may be seized by the Attorney General upon process issued pursuant to the Supplemental Rules for Certain Admiralty and Maritime Claims by any district court of the United States having jurisdiction over the property.... .

21 U.S.C. § 881 (1982).

### A. The Complaints

The expropriated banks argue that the government's action in this matter violated the applicable Supplemental Rules for Certain Admiralty and Maritime Claims (the "Admiralty Rules") because the complaints failed to comply with these Rules.[2] The Admiralty Rules provide as follows: "In actions in rem the complaint shall be verified on oath or solemn affirmation. It shall describe with reasonable particularity the property that is the subject of the action and state that it is within the district or will be during the pendency of the action." Rule C(2). Also, "the complaint shall state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." Rule E(2)(a).

### 1. Rule C(2) and Verification

■ The expropriated banks first contend that the complaints have not been properly verified because the complaints are not made upon personal knowledge but rather upon unstated information and belief. Moreover, contend the banks, the purported verification is signed by someone other than the person signing the complaint and it too rests upon unstated information and belief.

Rule C is silent as to the form of verification required. "In the absence of anything to the contrary in the local rules of the

---

**2.** Numerous statutes of the United States provide for the forfeiture of property used in violation of federal law in a maritime proceeding in rem or in a proceeding analogous thereto. And, the United States Code further provides in a catch-all provision [28 U.S.C. § 2461(b) ] that:

"Unless otherwise provided by Act of Congress, whenever a forfeiture of property is prescribed as a penalty for violation of an Act of Congress and the seizure takes place on the high seas or on navigable waters within the admiralty and maritime jurisdiction of the United States, such forfeiture may be enforced by libel in admiralty but in cases of seizures on land the forfeiture may be enforced by a proceeding by libel which shall conform as near as may be to proceedings in admiralty."

In practical effect, that means that forfeitures in the federal courts within the admiralty jurisdiction and those outside that jurisdiction may be handled the same procedurally, except that the claimants of property seized on land may be entitled to a jury trial. Many land seizures, even though in rem, have long been deemed common law actions that carry with them a constitutional right of jury trial. Notwithstanding that one vital difference, both the now superseded Supreme Court Admiralty Rules and the presently applicable Supplemental Rules of Civil Procedure governing Admiralty and Maritime Claims contain provisions governing these actions.

7A J. Moore & A. Pelaez, *Moore's Federal Practice* ¶ C.11 at 669 (2d ed. 1983) (footnotes omitted).

District within which the Complaint is filed, compliance with the verification procedures of the forum state should be sufficient." 7A J. Moore & A. Pelaez, *Moore's Federal Practice* ¶ C.08 at 662 (2d ed. 1983) (footnote omitted). We find that the complaints have been properly verified.[3]

Verification will be sufficient "if the affiant states that he knows or 'verily believes the facts stated in the pleading to be true.' "[4] 2A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 11.05 at 11–24 (2d ed. 1985) (footnote omitted). "[T]he sole purpose [of verification] is to cause an authorized official of the government to satisfy himself that the averments in the complaint are true, based either upon his own knowledge or upon information and belief." 7A J. Moore & A. Pelaez, *Moore's Federal Practice* ¶ B.09 at B–402 (2d ed. 1983).

> [W]hile it is not required that the verifying plaintiff have detailed personal knowledge of the transactions or events that give rise to the suit . . ., it is essential that "some person, party, attorney, advisor, or otherwise has responsibly investigated the allegations at the behest of the named plaintiff, who then stands behind the merits of the complaint." *Rogosin v. Steadman*, 65 F.R.D. 365, 367 (S.D.N.Y.1974).

*Brown v. Hart, Schaffner & Marx*, 96 F.R.D. 64, 67 (N.D.Ill.1982).

The complaints in these actions are signed by an Assistant United States Attorney based upon his information and belief. The complaints contain a verification by a Special Agent of the United States Department of Treasury, U.S. Customs Service, based upon both personal knowledge and information and belief. This satisfies the purpose and design of verification of pleadings—to insure that an individual has responsibly investigated the allegations and found them to have substance.[5]

### 2. Rule C(2) and Particularity

■ The expropriated banks next contend that the complaints fail to describe with reasonable particularity the property that is subject to the alleged forfeitures. The purpose of the particularity requirement is to enable the marshal to arrest the res described or, if it is intangible property, to enable the clerk to issue a summons directing those in control of the property to show cause why it should not be paid into court. 7A J. Moore & A. Pelaez, *Moore's Federal Practice* ¶ C.09 at 663 (2d ed. 1983). The complaints and the amended warrants for arrest fulfill this purpose.

The defendants-in-rem are adequately described. The complaints describe the defendants-in-rem as bank accounts of the named expropriated banks maintained at the named custodial banks. In most instances, the number of the bank account is

---

3. The government does not contend, nor could it possibly contend, that the complaints need not be verified.

> It has been held under the rescinded [Supreme Court] Admiralty Rules that [the verification] requirement does not apply to an in rem action commenced by the United States. However, the authority for that conclusion is somewhat suspect, and the plain language of . . . Rule [C] makes mention of no such exception. Because of the onerous economic impact arrest . . . can have, and because verification poses no appreciable barrier to the performance of governmental functions, it is not believed that the authority dispensing with the government's need to obtain verification should be followed today.

7A J. Moore & A. Pelaez, *Moore's Federal Practice* ¶ C.08 at 661 (2d ed. 1983) (footnote omitted).

4. According to a standard treatise, the following form of verification is sufficient:

> State of . . . . . . . . . . . . . . . . . . ) ss.:
> County of . . . . . . . . . . . . . . . . )
>
> Robert A. Johnson, being duly sworn, deposes and says that he resides at . . . . . . . . . . . .; that he is the plaintiff herein; and that he has read the foregoing complaint and knows the contents thereof and that the same are true of his own knowledge except as to the matters therein stated to be alleged on information and belief, and as to those matters he believes them to be true.

2A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 11.05 at 11–24 n. 1 (2d ed. 1985).

5. "[A] Complaint in rem that does not contain a verification can be amended to cure that defect." 7A J. Moore & A. Pelaez, *Moore's Federal Practice* ¶ C.08 at 662 (2d ed. 1983).

set forth. The warrants for arrest track the language of the complaints describing the defendants-in-rem and further limit the seized res to include only the moneys that belong to or are connected with FIB.[6] These descriptions are sufficient.[7] Moreover, in such a situation, any insufficiency is not grounds to vacate the warrants for arrest. *Cf. id.* ("[T]he admiralty has never displayed a tendency to defeat claims as a result of technical niceties, and coalescence of admiralty and civil procedures was surely not intended to alter that practice.") (footnote omitted).

### 3. Rule E and Circumstances

 Lastly, the expropriated banks argue that the complaints fail to state adequately the circumstances from which the claims arise. The government argues that all of the facts supporting its grounds for probable cause for seizure need not be set forth on the face of the complaint.

The purpose of Rule E is to provide those with an interest in the res and those named as defendants in the suit with specific information about the cause of action. *Id.* at ¶ E.03, E–102. Although the liberal pleading requirements apply to actions in rem, the complaint must apprise the defendant or those with an interest in the res of the basis of the complaint. *Id.* at E–103 to 104. The pleading of a legal conclusion without any facts upon which the conclusion is based will not suffice. *Id.* at E–104.

In the instant case, the complaints simply allege that the defendants-in-rem are subject to forfeiture pursuant to 21 U.S.C. § 881 because those money were

furnished or intended to be furnished in exchange for a controlled substance in violation of Title 21, United States Code, constitute[ ] proceeds traceable to an exchange of a controlled substance in violation of Title 21, United States Code, and/or [were] used to facilitate a violation of Title 21, United States Code.

Complaints ¶ 4. Alone, these allegations do not satisfy Rule E's requirement. However, the expropriated banks have been apprised of the basis of the complaints through other means—discussions with Assistant United States attorneys, a flowchart of the tainted moneys' stream,[8] and an affidavit of a Special Agent of the United States Customs Service used to support similar warrants of arrest seizing moneys maintained by FIB at CNB and Tower. Moreover, "it should go without saying that failure to abide with the pleading requirements should constitute a defect that can be freely remedied by amendment, and that the amended pleading should relate back to the date of the original filing so that it is not necessary to release property previously arrested or attached." 7A J. Moore & A. Pelaez, *Moore's Federal Practice* ¶ E.03 at E–106 (2d ed. 1983). Therefore, although the complaints are inadequate and should be amended, such defects cannot be a basis to vacate the warrants of arrest.

### B. Forfeitable Res

 The expropriated banks argue that the seized accounts do not contain a forfeitable res because the sums seized by the government are not "proceeds" traceable to an illicit exchange within the meaning of 21 U.S.C. § 881. They contend that the

---

**6.** As discussed, the warrants originally sought to seize all the moneys in the accounts. The government subsequently amended the warrants such that they sought to seize only the moneys traceable or attributable to FIB. The complaints still seek forfeiture of everything in the accounts. Obviously, these need to be amended; but this is not grounds to vacate the warrants.

**7.** Admittedly, there may be some difficulty in determining whether money belongs to, or is connected with, FIB, but this is not a reason to vacate the warrants. Some of the custodial

banks seem to be having problems. In fact, Marine Midland has moved to amend or vacate the warrants on the grounds that it cannot determine what money is connected to FIB. We must deny this motion for the reasons stated. However, the government should provide further guidelines to the custodial banks.

**8.** The expropriated banks contend that this flowchart contains information that is at least ten months old. Subsequent affidavits, however, contain more recent information.

only purpose of the funds wired from FIB's account at CNB to Banco Cafetero Panama's account at Irving Trust was to cover overdrafts, pursuant to the clearing agreement between FIB and Banco Cafetero Panama. These funds are then pooled with all the other funds from other sources credited to Banco Cafetero Panama's account and subsequently are disbursed. Accordingly, argue the expropriated banks, there is no way to trace the funds wired by CNB on account of FIB once they are credited to Banco Cafetero Panama's account. If we were to accept this argument, we would create a loophole by which to launder illegal moneys.

In support of their argument, the expropriated banks cite *Miller v. Wells Fargo Bank International Corp.*, 540 F.2d 548 (2d Cir.1976), in which the Second Circuit stated that

> [m]oney deposited in a general account at a bank does not remain the property of the depositer. Upon deposit of funds at a bank, the money deposited becomes the property of the depositary bank; the property of the depositor is the indebtedness of the bank to it, a mere chose in action.

*Id.* at 560. This case, however, does not stand for the proposition that the government cannot trace and seize the proceeds of narcotics transactions now in the form of account credits.[9]

The expropriated banks acknowledge that, when drug traffickers have deposited sums with a bank, the traffickers arguably create a forfeitable chose in action. They contend that "[t]he only *res* even arguably traceable to the purportedly illicit F.I.B. transactions would be the choses in action which came into existence in favor of F.I.B. upon the consummation of the transfers." Claimants' Reply Memorandum of Law in Support of Motion to Vacate Warrants for Arrest in Rem at 7. However, argue the banks, these choses in action are in the possession of FIB, and are not contained in the seized accounts. The government states, in a letter dated March 21, 1985, that it seeks forfeiture of the defendants-in-rem because "there is probable cause to believe that the accounts contain monies traceable to narcotics transaction. In this regard, the United States stands in the shoes of FIB and is entitled to any credit which FIB may have against Banco Cafetero funds." The expropriated banks argue that the warrants for arrest do not seek to seize such credits. Rather, contend the banks, the government has seized the expropriated banks' property, their choses in action against their own banks such as Irving Trust Company. Moreover, they point out that their accounts contain the funds of other customers besides FIB.

However, even if we were to accept their argument, the expropriated banks have not explained why the accounts cannot be seized if Banco Cafetero Panama was a knowing participant. In a declaration, a Special Agent of the United States Customs Service declared that he has "been informed that the United States has in its possession information establishing probable cause to believe that Banco Cafetero Panama was a knowing recipient of the proceeds of narcotics transactions. Most of this information is not yet public and I am informed that the revelation of this information at this time will jeopardize ongoing United States law enforcement operations." Declaration of Douglas Loo, ¶ 2. The expropriated banks do not directly contradict this declaration except to argue that they

> did not obtain the funds seized in these accounts in exchange for a controlled substance and they are not and could not

---

9. The government can levy upon and seize an intangible res such as account credits. Money laundering is an attempt to conceal the true source, amounts, and cash nature of funds derived from narcotics transactions. Sometimes, the moneys may be transformed into other forms. These forms may be seized by the government under 21 U.S.C. § 881 as traceable proceeds. Even if the new form is an intangible res, such as account credits, the government may seize it. Money is legal tender; it is the promise of the Federal Reserve to pay the face amount of the bill. Otherwise, green money is just paper. It is as intangible as account credits. Just as the government can seize the green papers we call "cash," it can seize account credits.

be claimed to have used those funds to facilitate any illicit transactions. When they do business with their customers, such as Chemical Bank and Citibank, they are not purchasing controlled substances. They are conducting legitimate bank business.

Claimants' Reply Memorandum of Law in Support of Motion to Vacate Warrants for Arrest in Rem at 8.[10] They also argue that the property of the banks is not the proceeds of alleged illicit transactions, citing to an affidavit of the Executive Vice President of Banco Cafetero Panama, wherein he explains the workings of the expropriated banks' accounts. *See* Order to Show Cause, Arango Affidavit ¶¶ 8–12. The government, however, seems to take the position that the relationship between Banco Cafetero Panama and its customer, FIB, also involved illegitimate transactions on both sides. The government asserts not only that the accounts contain moneys that are proceeds traceable to narcotics transactions but also that the restrained moneys and accounts were used to facilitate narcotics trafficking and the laundering of narcotics proceeds. The government asserts that it has probable cause to believe that the restrained accounts contain moneys forfeitable under each of these theories.

If Banco Cafetero Panama was a knowing participant in the laundering of narcotics proceeds, the government can seize these accounts as traceable proceeds and perhaps under the other theories.[11] The legislative history of section 881(a)(6) would support such a seizure:

> Due to the penal nature of forfeiture statutes, it is the intent of these provisions that property would be forfeited only if there is a substantial connection between the property and the underlying criminal activity which the statute seeks to prevent. Specifically, the Senate amendment provides for the forfeiture of

property exchanged or intended to be exchanged in an illegal drug transaction. In addition it provides for forfeiture of property which is the proceeds of an illegal drug transaction only if there is a traceable connection between such property and the illegal exchange of controlled substances. *Thus if such proceeds were, for example, commingled with other assets, involved in intervening legitimate transactions, or otherwise changed in form: they would still be subject to forfeiture, but only to the extent that it could be shown that a traceable connection to an illegal transaction in controlled substances existed.* Similarly, any moneys, negotiable instruments, or securities that were used or intended to be used to facilitate any violation of the Controlled Substances Act would be forfeitable only if they had some substantial connection to or were instrumental in, the commission of the underlying criminal activity which the statute seeks to prevent.

124 Cong.Rec. S17647 (daily ed. Oct. 7, 1978) (Joint Explanatory Statement of Titles II and III, reprinted in 1978 U.S.Code Cong. & Ad.News 9496, 9518, 9522–23) (emphasis added). The government has seized a forfeitable res.

However, the warrants attempt to attach after-acquired property ("new moneys"). Rule C of the Admiralty Rules is silent as to the propriety of arresting after-acquired property. Recently, the Second Circuit "read these rules not as prohibiting attachment of after-acquired property but as demonstrating only that attachment is impossible unless the person or institution possessing the property is contacted at some point." *Reibor International Ltd. v. Cargo Carriers (KACZ–CO.) Ltd.*, 759 F.2d 262, 265 (2d Cir.1985). It then held invalid a garnishment served before the garnishee came into possession of the prop-

---

**10.** The expropriated banks do contend that the declaration of the Special Agent is conclusory and not sufficient to overcome their affidavits. The cases cited by the banks involve affidavits insufficient to defeat motions for summary judgment. Such a motion is not before us.

**11.** If Banco Cafetero Panama was a knowing participant, the link to seize the other Banco Cafetero accounts is stronger. We reserve this issue for the subsequent hearing.

erty to be garnished. Likewise, we find the arrest of new moneys by the warrants invalid. Therefore, the seizures are ineffective to the extent they attempt to arrest new moneys.[12]

### C. Probable Cause

■ The expropriated banks argue that they are entitled to an order vacating the warrants for arrest because the government has not met its statutory burden of establishing probable cause. They contend that before the government can institute a forfeiture action it must show probable cause, which, they argue, it clearly has not done. The government argues that it need not show probable cause at this time; instead, the showing of probable cause for forfeiture is an issue reserved for trial and tested as of that time. In any event, contends the government, it has provided this Court and the expropriated banks with overwhelming evidence that the seized accounts received substantial sums of money, directly traceable to a narcotics operation in Colombia and, therefore, the seizures were proper.

The burden of proof in a forfeiture action is set forth in 19 U.S.C. § 1615, as incorporated by 21 U.S.C. § 881(d):[13]

In all suits or actions ... brought for the forfeiture of any vessel, vehicle, merchandise, or baggage seized under the provisions of any law relating to the collection of duties on imports or tonnage, where the property is claimed by any person, the burden of proof shall lie upon

such claimant ...: *Provided*, that probable cause shall be first shown for the institution of such suit or action, to be judged of by the court....

19 U.S.C. § 1615 (1982). Thus, "once the government has met its burden of showing probable cause to institute the forfeiture action, the burden then shifts to the claimant to show by a preponderance of the evidence that the property was not subject to forfeiture." *United States v. Twenty-Two Thousand, Two Hundred Eighty Seven Dollars ($22,287.00), United States Currency*, 709 F.2d 442, 446 (6th Cir.1983).

The government must show probable cause for belief that the seized property was used in violation of the narcotics laws, *i.e.*, was furnished in exchange for drugs, was proceeds traceable to such an exchange, and/or was used to facilitate a drug transaction.

The probable cause which the government must show is: "a reasonable ground for belief of guilt, supported by less than prima facie proof but more than mere suspicion." *United States v. One 1978 Chevrolet Impala*, 614 F.2d 983, 984 (5th Cir.1980); *United States v. One 1975 Mercedes 280S*, 590 F.2d 196 (6th Cir.1978). In making its probable cause showing, however, the government must also establish a nexus " 'between the property to be forfeited and the criminal activity defined by the statute;' i.e., the exchange of a controlled substance." *United States v. $364,960.00 in U.S. Currency*, 661 F.2d 319, 323 (5th Cir. 1981).

---

**12.** The expropriated banks also argue that there is no justification for seizing any money that came into the accounts between March 8, when the initial warrants were served, and March 18 and 19, when the amended warrants were served. Although the Court tends to agree, the government has not directly addressed this issue. Until we know the amount of new moneys seized and the government's reason for seizing them, the Court reserves this issue for the subsequent hearing.

There appears to be an additional problem with the warrants: they are not all limited to a specific amount, *i.e.*, the traceable proceeds. It is possible that the government believes that there is no limit because the moneys and accounts were allegedly used to facilitate drug

transactions and money-laundering. In any event, the government initially sought to seize $31 million ($27 million from FIB's account at CNB and $4 million from FIB's account at Tower), and the amount of money seized in all the accounts is less than this total.

**13.** The provisions of law relating to the seizure, summary and judicial forfeiture, and condemnation of property for violation of the customs laws ... shall apply to seizures and forfeitures incurred, or alleged to have been incurred, under any of the provisions of this subchapter, insofar as applicable and not inconsistent with the provisions hereof....

21 U.S.C.A. § 881(d) (West Supp.1985).

*Id.* at 446–47. If the government succeeds in showing probable cause to institute the forfeiture proceeding, the burden shifts to the claimant to show by a preponderance of the evidence that the property was not furnished in exchange for a controlled substance, was not proceeds traceable to such an exchange, and/or was not used to facilitate a drug transaction. *See United States v. $93,685.61 in U.S. Currency,* 730 F.2d 571, 572 (9th Cir.), *cert. denied,* — U.S. ——, 105 S.Ct. 119, 83 L.Ed.2d 61 (1984); *United States v. Eighty Three Thousand Three Hundred Twenty Dollars ($83,320) in United States Currency and Forty Dollars ($40) in Canadian Currency,* 682 F.2d 573, 577 (6th Cir.1982); *United States v. Three Hundred Sixty Four Thousand Nine Hundred Sixty Dollars ($364,960.00) in United States Currency,* 661 F.2d 319, 325 (5th Cir.1981).

The government need not establish probable cause when it commences a forfeiture action and obtains the warrants for arrest. Rule C(3) of the Admiralty Rules outlines the process for seizure as follows: "Upon the filing of the complaint the clerk shall forthwith issue a warrant for the arrest of the vessel or other property that is the subject of the action and deliver it to the marshal for service." Thus, the rules contemplate that the clerk shall issue the warrants for arrest and the court shall determine whether the government had probable cause. Logic, therefore, dictates that probable cause need not be shown when the government obtains the warrants for arrest. Ultimately, the government must show that it had probable cause at the time of commencement of the actions. It need not establish this, however, until the forfeiture trial.

▮ The expropriated banks also contend that the government has failed to show the requisite knowledge of the expropriated banks.[14] They argue that the government seized the accounts without probable cause to believe that the acts or omissions which would bring these accounts within section 881(a)(6) were committed or omitted with the knowledge or consent of the owners of the accounts. Moreover, contend the banks, none of the expropriated banks had any knowledge of or gave consent to improper acts or omissions. As noted earlier, the government takes the position that Banco Cafetero Panama was a knowing participant in the alleged laundering scheme. These issues, however, are also ones reserved for the forfeiture trial.

The expropriated banks argue that they have suffered irreparable harm and will continue to suffer irreparable injury if the warrants for arrest are not vacated. They contend that (1) the government's seizure has damaged their reputation both within the United States and internationally, (2) customers may cease doing business with the banks because of the government's seizure, and (3) they may be unable to honor commercial commitments to customers other than FIB by virtue of the seizures and, therefore, they will be liable for millions of dollars of claims. The government contends that any injury the expropriated banks will suffer in the absence of preliminary relief is economic injury, compensable in monetary damages. The government argues that this is not a reason to vacate the warrants. We agree that this reason alone is not grounds to vacate the warrants; however, it is a reason for the Court to hold a prompt hearing to determine whether the government and/or the expropriated banks have met their respective burdens. *See Castleberry v. Alcohol, Tobacco and Firearms Division of the Treasury Department of the United States,* 530 F.2d 672, 675 n. 5 (5th Cir.1976).

The government argues that the Court can rely on the declarations and affidavits submitted by the government for its determination that the government had probable cause. The expropriated banks contend

---

**14.** Section 881(a)(6) provides that "no property shall be forfeited under this paragraph, to the extent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner." 21 U.S.C. § 881(a)(6) (1982).

that the government's affidavits are insufficient because they are based upon information and belief, merely reveal a difference of opinion, and fail to set forth concrete facts. The banks contend that their affidavits set forth the nature of FIB's relationship with Banco Cafetero Panama which demonstrates the legality of the transactions and moneys. They argue that the government has not contradicted these affidavits except with suspicions and speculations, which are inadequate to overcome the banks' presentation. We find both parties' affidavits insufficient to determine the issues at bar. For example, peppered throughout the government's papers are assertions that not all of the information in the government's possession relating to the events and transactions at issue has been set forth. Without this information, the Court cannot determine many of the issues, such as the basis for the government's belief that Banco Cafetero Panama was a knowing participant. Just as the government's papers are lacking in information, so too are the expropriated banks' papers. For example, they do not address the government's assertion that Banco Cafetero Panama was a knowing participant. Although the banks explain some of the legal transactions between FIB and Banco Cafetero Panama, they do not claim that these are the only transactions between them. Therefore, the Court cannot make any final determination on the present papers. We cannot have a trial on the ultimate merits by affidavits alone. *Cf. In re Behrens,* 39

F.2d 561, 563 (2d Cir.1930) (In a summary proceeding for return of seized property, the court found "the undesirability of deciding the merits upon affidavits is peculiarly present because the affidavits are insufficient to let us know [certain details]."). *See generally* 6 (Part 2) J. Moore & J. Wicker, *Moore's Federal Practice* ¶ 56.22 (2d ed. 1982) (discussing the form of affidavits).

### D. Constitutional Contentions

■ The expropriated banks contend that the government's seizures of the accounts violate the fifth amendment of the United States Constitution.[15] They argue that Rule C of the Admiralty Rules is unconstitutional as applied because it fails to comply with the minimal standards of procedural due process: there was no review by any judicial official of the facts underlying the claim; no proper governmental interest has been advanced; and the government's information appeared to be at least ten months old. The most egregious prejudice, argue the banks, is the government's failure to provide them with a prompt post-seizure hearing. We do not find the seizures unconstitutional as applied.

Rule C has been in force for many years without a court declaring it unconstitutional *per se.* Although there have been some, but not a majority, of district courts that have found the Rule unconstitutional as applied,[16] no circuit court has found Rule C

---

**15.** The expropriated banks also argue that the government's seizure constitutes an unreasonable seizure of property in violation of the fourth amendment. This is merely a reargument, in constitutional terms, of the probable cause argument discussed above. We find their argument unpersuasive.

**16.** *See, e.g., Alyeska Pipeline Service Co. v. Bay Ridge,* 509 F.Supp. 1115 (D.Alaska 1981), *appeal dismissed,* 703 F.2d 381 (1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3526, 82 L.Ed.2d 852 (1984). This in rem action to recover the cleanup costs of an oil spill involved the arrest of the offending vessel pursuant to Rule C by the private party who cleaned the spill. The court found

the application of Rule C unconstitutional because only private interests were involved, a clerk issued the warrant of arrest without judicial participation, and there was no opportunity for a prompt post-seizure hearing. However, the court acknowledged that when local court rules add the steps demanded by the due process requirement, *e.g.,* post-seizure hearing, Rule C is constitutional.

In the case at bar, the opportunity for a post-seizure hearing could be, and in fact was, obtained. Moreover, a public interest is involved. The government has a substantial interest in controlling and curbing violations of narcotics laws. *See United States v. One 1971 BMW 4-Door Sedan,* 652 F.2d 817, 821 (9th Cir.1981).

unconstitutional as applied in circumstances like the case at bar.[17]

Moreover, Rule 12 of the Admiralty and Maritime Claims Rules of the United States District Courts for the Southern and Eastern Districts of New York provides for a hearing at which the claimants can contest various procedures, and the expropriated banks took advantage of this rule.[18] On Friday, March 8, 1985, the accounts were seized, and on Wednesday, March 13, 1985, the expropriated banks moved for an order that the government show cause why the warrants should not be vacated. A hearing was held on Friday, March 15, 1985. At that time, the expropriated banks contested several aspects of this action, as discussed in this opinion. A decision took some time to be rendered, primarily due to the many subsequent papers submitted by both parties and the shifting issues. The Court has determined that an additional hearing must be held. Any unconstitutional infirmities have been alleviated by the availability of a hearing under Rule 12 and by the subsequent hearing to be conducted.

CONCLUSION

At this time, we are compelled to deny the expropriated banks' motion to vacate the warrants except to the extent that the warrants are ineffective as to after-acquired property. We do see a need to have a prompt hearing on the merits. Therefore, such a hearing will be held as soon as the Court's calendar permits and the parties are ready. Meanwhile, the parties are to conduct discovery on an expedited basis

and we expect the government, as it has represented to the Court, to release any moneys and accounts that it subsequently finds not to be attributable to FIB.

SO ORDERED.

---

**17.** In *Lee v. Thornton*, 538 F.2d 27 (2d Cir.1976), the Second Circuit found unconstitutional the administrative procedures of detaining automobiles at border crossings. These procedures are conducted pursuant to various statutes, including 21 U.S.C. § 881. The court discussed the ability of the vehicle owner to initiate forfeiture proceedings to contest liability, but found that remedy impracticable under the circumstances. Weighing the need of a vehicle owner to be free from unreasonable detention against the inconvenience to the government of providing a prompt determination of the legality of the detention, the court held that a hearing on probable cause should be available within 72 hours. We are not confronted with similar considerations here except to the extent that funds of

other clients may be frozen, which is a different concern considered elsewhere.

**18.** The Judicial Conference Advisory Committee on the Federal Rules of Civil Procedure has proposed certain amendments to the Federal Rules of Civil Procedure. One proposal would amend Rule C to make available a prompt post-seizure hearing designed to satisfy the constitutional requirements of due process. It would guarantee a prompt hearing at which time the claimant can attack the complaint, the arrest, or any alleged deficiency in the proceedings up to that point. This proposed rule is based on Local Rule 12 of the Southern District of New York.