**UNITED STATES of America, Plaintiff,**

**v.**

**CERTAIN REAL PROPERTY AND PREMISES KNOWN AS 171–02 LIBERTY AVENUE, QUEENS, NEW YORK, Defendant.**

**No. 88 Civ. 0683.**

United States District Court, E.D. New York.

April 10, 1989.

Thomas M. Hollenhorst, Sp. Asst. U.S. Atty., Brooklyn, N.Y., for plaintiff.

O'Brien, McGarry, Murtagh & Mayr, Rockville Centre, N.Y., for claimants.

### MEMORANDUM AND ORDER

GLASSER, District Judge:

This is a case of first impression under the civil forfeiture provisions of the Comprehensive Crime Control Act of 1984, 21 U.S.C. § 881(a)(7) (West 1981 & Supp.1989). The Government moves for summary judgment against claimants Redino Greco and REGR Realty, Inc., pursuant to Fed.R. Civ.P. 56. For the reasons stated below, the Government's motion is denied.

*Facts*

The property in question is a two-story wood frame building located on the southeast corner of 171st Street and Liberty Avenue, in the Jamaica section of Queens, New York. Until 1980, the building's first floor was occupied by the "Monarch Bar & Grill." At the time of seizure, the second floor contained a heavily fortified, vacant, filthy apartment which allegedly was used to conduct sales of heroin, cocaine, crack and marijuana. There appears to be no dispute that the building is located in one of the most dangerous, drug-infested neighborhoods in all of New York City.

Claimant Redino Greco, a resident of Hicksville, Long Island, states that his grandfather purchased the building in the 1940s, and that his father ran the "Monarch Bar & Grill" there from about 1965 through 1980. In 1980, Greco's father died and title passed to Greco's mother and two aunts. The bar was closed in 1985 and the property went unused until seized by the Government on March 7, 1988. The Government asserts that the building was the scene of repeated felony drug violations from October 1986 through the date of seizure.

Sometime in 1985 or 1986, Greco decided to buy the building with the intention of repairing and then reselling it. He negotiated a price of $27,000 with his mother and his two aunts, borrowed $10,000 from his sister to finance the purchase, and set up a wholly-owned corporation, claimant REGR Realty, Inc., to purchase the building.

REGR Realty purchased the building on July 9, 1987. The Government asserts that Greco knew before, during and after the purchase that the building was the site of illegal drug trafficking. Greco admits that he became aware of the illegal activities after he bought the building, and does not deny that he was aware of such activities prior to purchasing the building.

According to deposition testimony submitted by Greco,[1] in the early summer of 1987, Officer George Reynolds of the New York City Police Department's 103rd Precinct contacted Greco three or four times by telephone and asked him if he would be willing to press criminal trespassing charges against persons arrested on the premises. Deposition of Sergeant Ernest Naspretto ["Naspretto Dep."] 7–10. Greco replied that he would like to cooperate, but that he was in the middle of litigation with his family over who owned the building, as well as disputes over the purchase price. *Id.*

In August or September of 1987, Sergeant Ernest Naspretto, also of the 103rd Precinct, met Greco at the building, where Greco was making repairs. Naspretto told Greco that, according to a *New York Daily News* article, the corner of 171st and Liberty Avenue had the highest number of crack-related arrests in the city, and that "most of that activity was generating from his building, most probably without his knowledge, and obviously without his consent." *Id.* 11–12. Naspretto renewed the request that Greco press charges against trespassers, and Greco agreed to do so, although he also expressed concern for his own safety. *Id.* 12–14. Naspretto also told Greco that he believed that the building's caretaker, Eddie "Shorty" Abbott, was involved in the drug trafficking. Greco disagreed, telling Naspretto that Shorty was a long-time family friend who had worked for Greco's father. *Id.* at 14–15; Affidavit of Sergeant Ernest Naspretto ["Naspretto Aff."] ¶ 6.

In the following months, fences were erected around the property in order to obstruct police surveillance, and steel doors with multiple slide bolt locks and peepholes were installed on the second floor to fortify it against police raids. Naspretto Dep. 17; Naspretto Aff. ¶ 8. Police Officer Dominic Greco (no relation to claimant) informed Greco of this, and Greco gave the police

---

**1.** Claimants appended Officer Ernest Naspretto's entire deposition transcript to their moving papers, pursuant to Fed.R.Civ.P. 56(e). Accordingly, the court deems claimants to have waived any evidentiary objections to the statements made in that deposition. The Government has raised no evidentiary objection to any portion of the Naspretto deposition transcript, and therefore is also deemed to have waived any such objection.

permission to tear down the fences and steel doors. Naspretto Aff. ¶¶ 8–9. Although the police repeatedly tore down the fences and knocked down the steel doors when conducting raids, the fences and doors always were quickly replaced. *Id.* ¶¶ 10–11. When questioned by police, "Shorty" Abbott consistently claimed ignorance of how the fences and doors kept reappearing. *Id.*

Naspretto continued to talk to Greco every week or two through December 1987. *Id.* at 13. Greco cooperated to the extent of pressing criminal charges against trespassers and allowing police to take down fences and steel doors. Indeed, a letter dated August 29, 1988 from the Queens County District Attorney's office commended Greco "for the service [he had] performed for this county and its citizens through [his] efforts" in a criminal trespass prosecution against an individual by the name of Grover Lewis. The letter stated that "[t]he successful operation of our justice system depends on people like you who are willing to spend time and effort to help make this county a better place in which to live."

However, despite Naspretto's repeated urgings, Greco did not fire "Shorty," who retained a key to the premises and allegedly permitted drug dealers to enter. *Id.* ¶ 13. Moreover, Greco's renovation of the building made it difficult for the police to sort out legitimate construction contractors whom Greco had hired to rehabilitate the building from other contractors hired by drug dealers to fortify the second floor against police raids.

Unsatisfied with Greco's degree of cooperation, Naspretto sent Greco a letter dated December 14, 1988 in which he outlined a plan for distinguishing legitimate from illegitimate construction contractors. Plaintiff's Exhibit ["PX"] 4. In the letter, Naspretto asked Greco to tell his legitimate contractors that, when questioned by police, they should say they were hired by Greco, and not by "Shorty." Naspretto also asked Greco to supply these contractors with Naspretto's business card. Anyone lacking a card, or claiming to have

been hired by Shorty, would be arrested for criminal trespassing.

The letter presented additional evidence linking "Shorty" to drug dealing, and requested that Greco sign and return a declaration authorizing the arrest of anyone found on the premises without a legitimate purpose.

The letter began with a warning: "Your total cooperation would also lend credibility to your claim that you have nothing to do with the illegal activities that transpire" on the property. *Id.* It also ended on a threatening note: "Remember, Mr. Greco, if you're not part of the solution, then you're part of the problem. Based on our past conversations you apparently wish to be part of the solution. I hope so." *Id.*

Greco did not sign the declaration, and did not adhere to the plan. Naspretto Dep. 18–19; Naspretto Aff. ¶ 12. In fact, a drug dealer arrested in the second floor apartment was found in possession of Naspretto's business card. Naspretto Aff. ¶ 12; Naspretto Dep. 32. Also, Greco continued to refuse to fire "Shorty."

In January 1988, Naspretto decided to cease further cooperative efforts with Greco. The building was seized on March 7, 1988, and no drug transactions have occurred there since that time.

At no time has the Government claimed that Greco profited from or played any part in the drug dealing that occurred on his property.

## DISCUSSION

### *Is Lack of Consent, By Itself, A Sufficient Defense?*

The forfeiture statute invoked by the Government states, in relevant part:

§ 881. Forfeitures

(a) Property subject

The following shall be subject to forfeiture to the United States and no property right shall exist in them: ...

(7) All real property, including any right, title, and interest (including any leasehold interest) in the whole of any lot or tract of land and any appurte-

nances or improvements, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this title punishable by more than one year's imprisonment, *except that no property shall be forfeited under this paragraph, to the extent of an interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.*

21 U.S.C.A. § 881 (West 1981 & Supp.1989) (emphasis added).

Thus, the statute provides an affirmative defense[2] to an owner who can establish that the illegal activities giving rise to the forfeiture occurred without his "knowledge or consent."

■ The principal issue before the court on this motion is whether Greco can assert this "innocent owner" defense even though he has conceded that he had "knowledge" of the drug trafficking on his property.

Greco claims that it is enough for him to establish that he did not "consent" to the criminal use of the property, which even the police were powerless to prevent, short of seizing the property.

The Government argues that Greco's lack of consent, by itself, is not enough to make out an affirmative defense under § 881(a)(7). According to the Government, lack of knowledge *and* lack of consent must be shown. Oddly, the Government relies on *Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 689, 94 S.Ct. 2080, 2094–95, 40 L.Ed.2d 452 (1974) and *United States v. One Tintoretto Painting, Etc.,* 691 F.2d 603, 607 (2d Cir.1982) for the proposition that a *constitutionally-based* defense to forfeiture requires the claimant to show "not only that he was uninvolved in and unaware of the wrongful activity, but also that he had done all that reasonably could be expected to prevent the proscribed use of his property[.]"[3] These cases are simply irrelevant. They dealt with *constitutional* defenses to forfeiture statutes which did not incorporate the ex-

---

**2.** The facts entitling the owner to the defense must be "established by that owner[.]" 21 U.S. C. § 881(a)(7). Thus, Greco has the burden of proof on the issues of his lack of "knowledge or consent." *United States v. 26.075 Acres, Etc.,* 687 F.Supp. 1005, 1014 (E.D.N.C.1988); *United States v. Two Tracts of Real Property, Etc.,* 665 F.Supp. 422, 424 (M.D.N.C.1987), *aff'd,* 856 F.2d 675 (4th Cir.1988); *United States v. A Parcel of Real Property Commonly Known as: 3400–3410 West 16th Street, Etc.,* 636 F.Supp. 142, 146 (N.D.Ill.1986); *United States v. Banco Cafetero International,* 608 F.Supp. 1394, 1405 (S.D.N.Y. 1985), *aff'd,* 797 F.2d 1154 (2d Cir.1986).

**3.** The Supreme Court in *Calero–Toledo* upheld the constitutionality of a Puerto Rican forfeiture statute which was "modeled after" 21 U.S.C. § 881(a) and which—like the federal statute at that time—contained no express statutory defense for "innocent" owners. *Id.,* 416 U.S. at 686 n. 25, 665 n. 1, 94 S.Ct. at 2093 n. 25, 2083 n. 1. In much-cited *dicta,* however, the Court noted that forfeiture could, "in other circumstances, give rise to serious constitutional questions." *Id.,* 416 U.S. at 689, 94 S.Ct. at 2094. The Court noted two such circumstances: (1) where "an owner whose property subjected to forfeiture had been taken away from him without his privity or consent"; and (2) where an owner "proved not only that he was uninvolved in and unaware of the wrongful activity, but also that he had done all that reasonably could be expect-

ed to prevent the proscribed use of his property[.]" *Id.* The Court stated that, in the latter circumstance, "it would be difficult to conclude that forfeiture served legitimate purposes and was not unduly oppressive." *Id.,* 416 U.S. at 689–90, 94 S.Ct. at 2095.

Subsequently, the Second Circuit relied upon the latter part of the *Calero–Toledo dicta* in denying the Government's motion for summary judgment in a forfeiture case brought under 18 U.S.C. § 545. *United States v. One Tintoretto Painting, Etc., supra.* There, the Government had argued that the *only* constitutional defense to forfeiture was the first one mentioned in *Calero–Toledo*—namely, that the property had been taken from the owner without his consent. *Id.,* 691 F.2d at 607. The Second Circuit disagreed, and—without disapproving the "lack of consent" defense—held that claimant was entitled to attempt to prove at trial that "he was uninvolved in and unaware of the wrongful activity [and] had done all that reasonably could be expected to prevent the proscribed use of his property[.]"

While the instant case might have presented an opportunity to recognize the existence of a constitutional "lack of consent" defense to forfeiture, the court finds it unnecessary to reach the issue because § 881(a)(7), unlike the forfeiture statutes in *Calero–Toledo* and *One Tintoretto,* expressly provides for an affirmative defense of lack of "knowledge *or* consent."

press "knowledge or consent" defense contained in § 881(a)(7). Here, the court is concerned with the precise meaning of the *statutory* defense set forth in § 881(a)(7). The Government has not cited a single case construing this *statutory* defense.[4]

The court's own research has not disclosed a single forfeiture case under § 881(a)(7) in which a claimant asserting an "innocent owner" defense was excused from having to prove his lack of knowledge of the criminal activity occurring on his property. However, this appears to be the first case under § 881(a)(7) in which the claimant has conceded the issue of knowledge and relies entirely on his lack of consent.

Under these circumstances, the statutory language is all the court has to go on. Fortunately, it is enough. The statute expressly provides that an owner's interest shall not be forfeited "by reason of any act or omission established by that owner to have been committed or omitted without the *knowledge or consent* of that owner." 21 U.S.C. § 881(a)(7) (emphasis added).

Under normal canons of statutory construction, the court must give effect to Congress' use of the word "or" by reading the terms "knowledge" and "consent" disjunctively. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 338–39, 99 S.Ct. 2326, 2330–31, 60 L.Ed.2d 931 (1979) (court cannot ignore the disjunctive "or" so as to rob the nouns it separates of their *"independent and ordinary significance"*; emphasis added); *FCC v. Pacifica Foundation*, 438 U.S. 726, 739–40, 98 S.Ct. 3026, 3035–36, 57

L.Ed.2d 1073 (1978) (terms connected by a disjunctive must be given separate meanings); *United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–20, 99 L.Ed. 615 (1955) (court must give effect, if possible, to every word Congress used).

Accordingly, the court interprets the statute as creating an affirmative defense where the illegal acts giving rise to the forfeiture occurred without the knowledge *or without the consent* of the owner. If Congress had meant to require a showing of lack of knowledge in all cases, as suggested by the Government, it could have done so by replacing "or" with "and." Alternatively, Congress could have written the relevant language from *Calero–Toldeo* into the statute. It did neither of these things.[5]

### *Evidence Regarding Lack of Consent*

■ As previously indicated, Greco cooperated with the police by pressing criminal trespassing charges against persons found on the property, and by permitting the police to tear down fences and steel doors installed on the property by drug dealers. At oral argument, the Government conceded that the police sought Greco's assistance in prosecuting trespassers because probable cause was often lacking to arrest suspects for drug dealing. Transcript of February 10, 1989 Hearing ["H.Tr."] 17. The court cannot comprehend why Greco was obligated to provide even this much cooperation in order to avoid forfeiture— but the Government argues that what Greco did was not enough.

---

4. At least one court has recognized that the statutory defense contained in § 881(a)(7) is broader than the constitutional defense suggested in *Calero–Toledo. United States v. Lots 12, 13, 14, and 15, Etc.*, 869 F.2d 942, 947 (6th Cir.1989), (statutory "innocent owner" defense of § 881(a)(7), unlike *Calero–Toledo*'s constitutional defense, does not require claimant to prove that he has done all he could reasonably be expected to do to prevent the proscribed use of his property).

5. Inexplicably, some cases support the Government's argument that it is essential to establish lack of knowledge in order to make out a statutory defense of "innocent ownership" under § 881(a)(7). *See, e.g., United States v. 124 East North Avenue, Etc.*, 651 F.Supp. 1350, 1357

(N.D.Ill.1987) (denying government's summary judgment motion to permit wife to prove at trial that "she had no knowledge of *and* gave no consent to her husband's alleged unlawful activities"; emphasis added); *United States v. Premises Known as 1908–1910 Jackson Street, Etc.*, No. 86–1389, 1987 WL 13086, LEXIS slip op. at 5 (E.D.Pa. June 26, 1987), available at 1987 U.S. Dist. LEXIS 5681 (claimants asserting innocent owner defense under § 881(a)(7) must show "they had no knowledge of *nor* gave their consent to the illegal acts" committed on the premises; emphasis added).

The court can only surmise that the issue has never before been so starkly presented as in the instant case.

According to the Government, Greco "consented" to the illegal drug trafficking by failing to do everything possible to convince the police, in Sergeant Naspretto's words, that he was "part of the solution [and not] part of the problem." PX 4.

Greco persuasively argues that he cannot be regarded as having "consented" to illegal activities simply because he declined to take heroic personal risks in the war on drugs. He submits specific evidence to prove how unreasonable it was for the police to require him to do what they could not do themselves.

First, he points to Sergeant Naspretto's deposition testimony, which portrays the neighborhood as an urban battle zone whose residents correctly perceive cooperation with the authorities as being extremely dangerous:

Q [W]as there not during that period of time an incident in the [103rd] precinct whereby an officer was shot and killed?

A Yes.

Q That was Officer Byrne?

A Right.

Q Do you recall what the date—

A February 26th.

Q In fact, was not Officer Byrne guarding the premises of a gentleman whose name I believe was Arjune?

A Arjune, yes.

Q Mr. Arjune was someone who was cooperating with the government and was going to give testimony; is that correct?

A That is correct.

Q Did anyone else in the precinct that you were aware of in your duties as the community patrol supervisor, express to you fear about what these crack dealers were doing to the neighborhood and what they might do to themselves or people's families?

A All the time. Daily basis.

Q On a daily basis?

A Yes.

Q What were some of the things that you recall that the people were concerned about in terms of what these crack deal-ers would do to either them or their families?

A Well, that they had lost their neighborhood to crack dealers. They expressed concern that their kids just going to school might get shot in a crossfire because of turf wars.

They also expressed a concern if they came forward and pointed anyone out, you know, that they would be targets like Arjune was.

Q That's what I want to get to, sir. There was then a sentiment in the community, in the precinct that you were involved with, that people were afraid for their own safety if, in fact, they stepped forward to cooperate with the authorities; is that true, sir?

A Yes.

Q Was that a widespread concern by people in the community?

A A widespread concern, yeah, I would say so.

Q In fact, sir, these concerns were made by people who actually lived in the community and were present their [sic] every day, living there, working there, et cetera?

A Exactly, yes.

Q Isn't it a fact, sir, too, that during the course of these many drug arrests that were made, let's say, in the year 1987 by either yourself or members of that particular precinct, were there not a lot of firearms involved with the seizure of drugs?

A Yes.

Q We are not talking about just small firearms. We are talking about automatic weapons; is that not correct, sir?

A Yes.

Q In fact, if memory serves me correctly, they had fire power that often times exceeded that which the police department had?

A Yes.

Q Sir, do you think in that climate as it existed in the precinct in the year 1987 and up through, let's say March of 1988, and certainly during the time that Officer Byrne was tragically killed, did there exist in the community a legitimate fear

on the part of the residents, the people you just described, people who worked in the area, for their own safety concerning the extent of the drug activity which was taking place in that precinct?

A Yes.

Naspretto Dep. 33–36.

Second, Greco points to an incident which directly undermined his confidence in the ability or willingness of the system to protect him in return for his cooperation. After Greco complied with police requests to press criminal trespassing charges against Grover Lewis, Lewis pled guilty and was conditionally discharged in August 1987, returning immediately to the street and serving no jail time. Understandably, Greco interprets this as a lack of police commitment to his personal safety.

The Government claims that if Greco had only cooperated more fully, the Government, in the benevolent exercise of its prosecutorial discretion, would have declined to bring this forfeiture action. H.Tr. 16. However, at oral argument, when asked to specify what Greco could have done to avoid this forfeiture action, the Government had very little to say. For instance, the Government contended that Greco should have fired "Shorty" Abbott—even though the police lacked sufficient information to arrest Abbott. *Id.* 11–12. However, the Government conceded that even Mr. Abbott's arrest "would not have solved the problem." *Id.* 11.

The Government also suggested that Greco could have done more to help identify and prosecute trespassers. *Id.* 12. Yet it also admitted that arresting the drug dealers was futile, because "two hours later they would be back." *Id.*

The Government even suggested that Greco should have boarded up his property—an action totally inconsistent with Greco's professed desire to fix up and resell the building. The Government conceded, however, that the property still would have been subject to forfeiture had the drug dealers broken down the hypothetical barricades and resumed use of the property—

not an unlikely event, in view of the dealers' propensity for installing steel doors and fences. *Id.* 12, 16.

In a moment of candor, however, the Government admitted what had already become obvious to this court: that it was simply not within Greco's power to save his property, because nothing short of forfeiture could have permanently eliminated drug dealers from the premises.

MR. HOLLENHORST: The police continued to make drug busts at the property. They continued to throw people off the property who were selling drugs there and arresting trespassers, but unfortunately, the police powers of law enforcement do not correct the problem. *The only way to absolutely correct the problem is to seize and forfeit the property.*

H.Tr. 9–10 (emphasis added).

In short, the Government has failed to prove that Greco "consented" to the illegal use of his property. The Government has proven only that it took Greco's property, without just compensation, for the public purpose of fighting the war on drugs.[6] Except for the troubling fact that a drug dealer was found in possession of Sergeant Naspretto's business card—a fact which can be brought out at trial—the Government offered no evidence relevant to the issue of Greco's lack of consent.

The Government has failed to carry its burden on its motion for summary judgment of showing that there is no genuine issue of material fact to be tried. *Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Moreover, the court finds that Greco has raised genuine issues of material fact concerning his lack of consent, since he has proffered sufficient evidence for a jury to return a verdict in his favor. *Id.*, 477 U.S. at 249, 106 S.Ct. at 2510.

Accordingly, Greco must be afforded an opportunity to prove his "lack of consent" defense at trial.

---

**6.** *See Calero–Toledo,* 416 U.S. at 694, 94 S.Ct. at 2097 (Douglas, J., dissenting in part) (forfeiture violated "just compensation" clause of Fifth Amendment).

*Conclusion*

The Government's motion for summary judgment is denied.

SO ORDERED.