UNITED STATES of America, Plaintiff,

v.

SIXTY (60) ACRES, More or Less WITH IMPROVEMENTS, LOCATED IN ETOWAH COUNTY, ALABAMA, Defendant.

Evelyn Charlene Ellis, Claimant.

Civ. A. No. 89–AR–0348–M.

United States District Court,
N.D. Alabama, M.D.

May 11, 1990.

Frank W. Donaldson and Robert P. Barclift, Office of the U.S. Atty., Birmingham, Ala., for plaintiff.

David C. Johnson, Johnson & Cory, P.C., Birmingham, Ala., for defendant.

Robert R. Black, Johnson & Cory, P.C., Birmingham, Ala., for claimant.

**1.** *Order Entered on February 9, 1990*

The court has for consideration the motion of claimant, Evelyn Charlene Ellis, of January 16, 1990, seeking relief from the judgment entered by the court on January 5, 1990. This court DEEMS this a motion pursuant to Rules 59(a)(2) and 52(b), F.R.Civ.P. In its brief opposing claimant's motion, the United States points out that the material contained in the three affidavits filed by claimant in support of her post-trial motion does not constitute "newly discovered evidence" in that it was fully available to claimant at trial. This may be true. It is also true that Rule 59(a)(2) allows the court, in its discretion, after a bench trial, to "open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions and direct the entry of any judgment." At trial perhaps Mrs. Ellis and her counsel failed fully to comprehend the availability or importance of the alternative theory of "lack of consent" for avoiding a forfeiture. The United States also manifested little comprehension of this alternative theory.

The brief filed by the United States in opposition to Mrs. Ellis' post-trial motion seems to contain a *post-trial request of its own*. This is inconsistent with its insistence that the case is closed. The United States asks the court to reconsider the court's implied finding in favor of Mrs. Ellis as to her alleged personal involvement with cocaine and, instead, asks the court to find that Mrs. Ellis actually participated in various cocaine activities on her 60 acres. This newly introduced subject overlooks the fact that the complaint filed by the United States on March 2, 1989, charged that this 60 acres "was used to facilitate the storage, sale and distribution of *marijuana*." (emphasis supplied). It nowhere mentioned *cocaine* and never was amended to mention *cocaine*. There was nothing in the pre-trial order to alert the court or Mrs. Ellis that the United States intended to claim actual or direct participation by Mrs. Ellis

## MEMORANDUM OPINION

ACKER, District Judge.

On complaint of the United States, this court, on January 5, 1990, pursuant to findings of fact and conclusions of law contained in a memorandum opinion published at 727 F.Supp. 1414 (N.D.Ala.1990), ordered the forfeiture of sixty (60) acres in Etowah County, Alabama, owned by Evelyn Charlene Ellis. Thereafter, in response to a timely post-trial motion by Mrs. Ellis, the court, on February 9, 1990, entered an order pursuant to Rules 59(a)(2) and 52(b), F.R.Civ.P.,[1] reopening the case for the limited purpose of reconsidering the evidence and receiving additional evidence bearing in *cocaine* activity on her property. Instead, the United States depended for the viability of its forfeiture proceeding on the single *marijuana* transaction engaged in by Mr. Ellis and described in the complaint. If the case had proceeded to trial with a jury, as originally contemplated, evidence of alleged use or distribution of cocaine by Mrs. Ellis herself *at a time remote to* this particular marijuana sale by Mr. Ellis would only have been allowed, it at all, in rebuttal to a more vigorous effort by Mrs. Ellis to prove her fear of her husband.

This court has no way of knowing how convincing the live testimony of Kelli Veronica Ellis, of Charlene Samantha Tucker and/or of Evelyn Charlene Ellis would have been, or may be, if subjected to cross-examination and if viewed in the light of any rebuttal evidence offered by the United States. As this court said in its opinion of January 5, 1990, Mrs. Ellis, on a theory of "lack of consent," had the burden of proving "the kind or character of duress or of control or or of dominance which would have precluded her from exercising the degree of responsibility of citizenship which required her to take at least *some* overt action to deter her husband's course of action." Memorandum opinion of January 5, 1990, p. 13.

In fairness, the court believes that Mrs. Ellis should still be afforded an opportunity knowingly to undertake to avoid forfeiture by offering evidence which she says she failed to offer out of fear of her husband. She now says that she is willing to take the risk of harm to herself and *her daughters which she did not take earlier*. Therefore, in an exercise of this court's discretion, the opinion and order of January 5, 1990, are hereby VACATED. The case shall be REOPENED, but it will be limited to the receipt of the criminal record of Hobert Ellis and the testimony of Kelli Veronica Ellis, Charlene Samantha Tucker and/or Evelyn Charlene Ellis, bearing on the single issue of claimant's "consent" or "lack of consent" to the drug activities of Mr. Ellis, plus, of course, any rebuttal evi-

on the single question of whether or not Mrs. Ellis, in fact and law, "consented" to her husband's illegal drug-related activities conducted on her said sixty acres.

*Additional Findings of Pertinent Fact*

The findings of fact contained in the opinion of January 5, 1990, need not be repeated, except to the extent that this opinion may reflect alterations in the court's interpretation of some of those facts in light of the newly received evidence.

■ The court certainly does not change its finding that Mrs. Ellis was aware of Mr. Ellis' use of her property for his marijuana distribution business. The fact that she was not aware of the particular marijuana sale which precipitated this forfeiture proceeding does not mean that her eyes were always closed. In other words, the court is still of the opinion that Mrs. Ellis failed to meet her burden of proving "lack of knowledge" as one means of proving her personal "innocence."

■ There is testimony from third parties that Mrs. Ellis personally used cocaine on her premises and elsewhere on occasion. She denied using cocaine. It is unnecessary for the court to reconcile this clear conflict in the evidence, because if Mrs. Ellis did occasionally use cocaine on her premises, or elsewhere, her said use is not, in and of itself, a basis for forfeiture *under the allegations contained in this particular complaint for forfeiture.* A forfeiture proceeding, being quasi-penal in nature, requires more precision in pleading than an ordinary civil complaint. It has a certain kinship with an indictment and cannot be so loose as to require a claimant to prepare to prove or to disprove ultimate issues which "notice pleading" in ordinary civil cases might permit. The court initially received into evidence the testimony about Mrs. Ellis' alleged drug use because it was relevant to the question of whether or not she had *knowledge* of her husband's activities. The court received further evidence offered by the United States, including any evidence of Mrs. Ellis' personal, voluntary participation in drug activities in the past.

dence on the same subject because it was relevant to whether or not she "consented" to the use of her premises, as charged by the United States in its complaint, "to facilitate the storage, sale and distribution of *marijuana.*" (emphasis supplied).

The brief submitted by the United States on April 27, 1990, consists almost entirely of an argument that this court cannot take judicial notice of the testimony of Connie Lee Best, Ph.D., offered by the United States in a criminal case recently tried by this court to a jury, *United States v. Stewart*, CR 89–AR–302–J. During this trial extension, the court shared with counsel the substance of Dr. Best's testimony and marked it as Court's Exhibit 1 for the record. On March 8, 1990, *after* this court's orders of January 5, 1990, and February 9, 1990, Dr. Best testified in *United States v. Stewart* as a government witness. It is understandable that the United States would worry about the effect on this court of Dr. Best's testimony in *United States v. Stewart.* Dr. Best is a learned, articulate and persuasive expert on "post-traumatic stress disorder" (PTSD), and in *United States v. Stewart* she greatly assisted the United States in convincing a jury that a wife who was deathly afraid of her husband would docilely follow his commands, like Pavlov's dog, despite possible criminal consequences. While Dr. Best was convincing the jury that Mr. Stewart kidnapped Mrs. Stewart without using any weapon (the crime of kidnapping necessarily requiring proof beyond a reasonable doubt of *a lack of consent* by the person being kidnapped), Dr. Best also succeeded in adding to this court's general and specific knowledge.

■ This court thoroughly agrees with the United States that this court cannot judicially know for the purposes of this case evidence received in another case. However, it is totally unnecessary for this court to take judicial notice of, or to receive into evidence, things it has learned in life,

The case, as thus reopened, is SET for trial continuation on February 26, 1990, at 9:30 A.M.

be they learned while sitting behind a school desk, or by reading a book, or in the school of hard knocks, or while sitting on the bench. The parties in the instant case deliberately chose a bench trial. Triers of fact, be they juries or judges, cannot divorce themselves from their backgrounds, what they have experienced, no matter what the source of their general knowledge. There is a crucial distinction between judicial knowledge and ways of understanding human behavior. Therefore, it is a mere coincidence that this court underwent a recent learning experience inadvertently administered by the United States, whose highly credible witness, Dr. Best, was the teacher.[2]

Shortly after marrying handsome Mr. Ellis after a short courtship, Mrs. Ellis found out that he was on parole after having been convicted and incarcerated for beating to death his previous wife. As an example of Mr. Ellis' violent personality, when Mrs.

Ellis inadvertently allowed the pigs to escape, Mr. Ellis, in a rage, choked her, fortunately not with the same consequences as the violence he displayed when he became outraged with his previous wife. Mr. Ellis not only was mean and cruel toward Mrs. Ellis and her two daughters, but he actually threatened to kill Mrs. Ellis, a threat which was credible under the overall circumstances. That such a threat was made was not only the testimony of Mrs. Ellis but was included in the deposition testimony of Joel Helms, a witness whose deposition was offered into evidence by the government itself. In fact, Mr. Ellis told Mr. Helms that if Mrs. Ellis ever left him, he would have her "done away with." Mr. Helms expressed a telling personal judgment from a perspective that gave him a good opportunity to form a judgment, namely, that "if she [Mrs. Ellis] had reported Hobert [Mr. Ellis] to Federal authorities about drug dealing, she wouldn't be here

**2.** The following are selected quotations from Dr. Best:

It [post-traumatic stress disorder] is most chiefly characterized by fear, terror, and extreme helplessness. The stressful event typically involves a threat to a person's life; a threat to a person's physical integrity, meaning some harm will be done to their body; a threat to a close relative or friend or family member; seeing or witnessing another person being killed or seriously injured. All of those are the most common reasons why a person would develop a post-traumatic stress disorder.

\* \* \* \* \* \*

It is not surprising to me at all. That is extremely common that a person who is severely traumatized and fearful for their life or fearful for the life of a family member. That's the overriding principle. The key is fear and anxiety, whether—showing it outwardly does not mean that a person is not terrified. The fact that she did not, that she was essentially compliant, is not uncommon for people. It would certainly not be uncommon to have been in that long term abuse pattern situation such as a battered wife. It was not uncommon for individuals in concentration camps during World War II in Auschwitz, where people who were imprisoned there actually played for the Germans, played musical instruments.

\* \* \* \* \* \*

A victim's behavior, once again it's sort of the same thing I was just talking about, can appear very strange to somebody else. They can do things. The fact that she would tell neighbors a story does not surprise me. If she was fearful that if she did not do that, that either at that

point in time or even at a later point in time ... that she would suffer the consequences of that, it is not surprising that she would do that.

\* \* \* \* \* \*

But the idea, the notion that was paramount or that was there was that her life in her mind was in danger, her perception of her life being in danger was in danger when she was separated from her husband. And the safety of her family members was in jeopardy when she was away from her husband. When she was in his presence, that is almost a safety time. That is, may be less fearful for her.

In fact, it had been the history. When she had been returned to his presence, that is the time at which, by her report, he was much nicer to her, he was much kinder to her.

\* \* \* \* \* \*

[I]'m doing what my husband tells me to do, this is the time that I will be safe and my family will be safe. So to hear that, it sounds backward. It sound [sic] like that ought to be the time that the person would be the most upset. And I'm sure it sounds like that to a person who has not experienced it.

\* \* \* \* \* \*

[T]he victim thinks that the batterer basically has supernatural powers, that they are omnipotent, that they are all powerful, and while indeed this person may now be in custody, her husband may be in the custody of the F.B.I., what typically goes on in their mind is, well, he may be in custody now, but he'll get out. He will get out of this somehow. He always gets out of it and he always follows through with what he says. And what he says is "I'm going to get you".

today." Mr. Ellis owned several guns, including a semi-automatic rifle, too many guns just to keep the rabbits out of the turnip patch. Mr. Ellis drank as much as a half a case of beer a day, a fact which did not tranquilize him or render him lovable.

Convincing further proof of Mr. Ellis' dominance and control over Mrs. Ellis, even from a distance, comes from the fact that he told her to appear for his parole hearing during his incarceration, and she did so because she thought she had to. She even lied to her own mother, telling her that she and Mr. Ellis were getting along. Her mother had good reason to know better, because she had seen Mr. Ellis in a bad mood and, in fact, had herself succumbed to one of Mr. Ellis' threats by executing a deed when he demanded it. Greg Compton, another government witness, testified that he was familiar with Mr. Ellis' reputation, and that Mr. Ellis was a "madman." One of Mrs. Ellis' daughters described her stepfather to Mr. Compton as "the devil." Kelli, one of the daughters, personally testified that she and her sister were as afraid of Mr. Ellis as their mother was.

The long and the short of it is that Mrs. Ellis was physically and mentally incapable of stopping Mr. Ellis' illegal drug activities or of reporting him to the authorities. Her understandable desire to stay alive overrode any desire she might otherwise have had to be a public-spirited citizen. The testimony describing Mrs. Ellis as Mr. Ellis' "slave" was not inaccurate.

### Conclusions of Law

■ This court does not differ with the holding of the Third Circuit in *United States v. 107.9 Acre Parcel of Land Located in Warren Township, Bradford County, Pennsylvania*, 898 F.2d 396 (3rd Cir. 1990), cited by the government in its brief of May 1, 1990. There the Third Circuit said:

In the criminal law context, at least, duress contains three elements: (1) an immediate threat of death or serious bodily injury, (2) a well-grounded fear that the threat will be carried out, and (3) no reasonable opportunity to escape the threatened harm. *For purposes of this case, we will assume that less demanding proof is required in a civil context, and that the standard could be met by a preponderance of the evidence that the claimant's actions were not the product of his or her own free will.*

898 F.2d at 399 (emphasis supplied).

The last line of the government's brief of May 1, 1990, tries to capitalize on *107.9 Acres* by saying:

In the present case, Mrs. Ellis certainly had ample opportunity to escape Mr. Ellis' threatened harm but chose not to do so.

With this conclusion, this court respectfully disagrees. Mrs. Ellis' range of choice was, as a practical matter, so limited as to preclude a finding by this court of "consent" as that term is properly understood in the context of the statute here being applied. One definition of "consent" (the proper one in this case) is *"voluntarily* yielding the will to the proposition of another." (emphasis supplied). *Black's Law Dictionary* (Revised 4th ed. 1968). Any trier of fact who is required to look into the human psyche to discern a dispositive fact has a difficult task at best. He or she must rely not only upon personal experience but on the ability to ascertain the credibility of the witnesses. This court finds credible the testimony tending to show overwhelming duress upon Mrs. Ellis. The court would have liked to have heard from Mr. Ellis himself, but he was in jail and not produced by either party. Whether or not in the marriage ceremony he insisted that Mrs. Ellis promise to "obey" him, she did, in fact, obey him.

The issue in this case is not whether Mrs. Ellis is a nice or an "innocent" person in the broadest sense. If it were, this court might be called upon to cast the first stone. The issue is simply whether she *"consented"* to the misuse of her real property for a marijuana operation. This court concludes at bottom that considering what Mrs. Ellis' choices were, she met her burden of proving by a preponderance of the evidence that her "actions were not the product of . . . her own free will." In other

words, she never "consented" to Mr. Ellis' conducting a marijuana business on her property. She was forced by circumstances to turn her eyes rather than to turn her husband in. She was not required to be a hero in order to save her property. As the court said in *U.S. v. Premises Known as 171–02 Liberty Avenue,* 710 F.Supp. 46, 51 (E.D.N.Y.1989), "the [claimant] cannot be regarded as having 'consented' to illegal activities simply because he declined to take heroic personal risks in the war on drugs."

One of the most recent expressions by the Eleventh Circuit on the forfeiture statute here invoked by the government is in *U.S. v. One Single Family Residence,* 894 F.2d 1511 (11th Cir.1990). There the Eleventh Circuit said:

> [E]ven as Congress escalated its offense in the ongoing "war against drugs" by expanding the scope of property subject to civil forfeiture, it coupled with the forfeiture a proviso, taken verbatim from section 881(a)(6), protecting innocent owners. Explaining the aim of the innocent-owner exception, Congress stated:
>
> > [I]t should be pointed out that no property would be forfeited under the Senate amendment to the extent of the interest of any innocent owner of such property. The term "owner" should be broadly interpreted to include any person with a recognizable legal or equitable interest in the property seized. Specifically the property would not be subject to forfeiture unless the owner of such property knew or consented to the fact that [the property was used for or traceable to illegal drug activities].

894 F.2d at 1514 (footnote omitted) (brackets the court's). There is nothing in this rendition of legislative history which redefines "consent" to mean "knowledge of illegal activity without affirmative action to stop it in the face of real danger."

Based on these findings and conclusions, the order of January 5, 1990, will be vacated and the forfeiture proceeding dismissed.