UNITED STATES of America, Plaintiff,

v.

**ALL RIGHT, TITLE AND INTEREST IN PROPERTY AND PREMISES KNOWN AS 710 MAIN STREET, PEEKSKILL, NEW YORK, and Business Interests Therein known as Bunch's Place and the Video Arcade, Defendant.**

No. 88 Civ. 7509.

United States District Court,
S.D. New York.

Aug. 13, 1990.

**512**

Otto Obermaier, U.S. Atty., S.D.N.Y., New York City (Timothy MacFall, Sp. Asst. U.S. Atty., of counsel), for plaintiff.

Hersh & Kornfeld, Peekskill, N.Y. (Leon Kornfeld, of counsel), for claimant Jesse James Bunch.

## OPINION

IRVING BEN COOPER, District Judge.

The United States of America (the "government") commenced this civil in rem forfeiture action on October 21, 1988 by filing a verified complaint against the premises and real property located at 710 Main Street, Peekskill, New York (the "property"). On that same date, the United States Marshal seized the property pursuant to a seizure warrant issued by United States District Court Judge Robert W. Sweet. Jesse James Bunch filed the only claim to the property in opposition to this forfeiture action.

The government's complaint alleges that the property was used, or was intended to be used, to facilitate narcotics transactions with Mr. Bunch's knowledge and consent, thus subjecting the property to forfeiture under 21 U.S.C. § 881(a)(7) (1988).

Mr. Bunch denies the government's allegations and claims that he did not know of or consent to any narcotics or other illegal activity that may have occurred on the premises; he also seeks to invoke the "innocent owner" defense that is statutorily created by 21 U.S.C. § 881(a)(7).

The action was tried before this Court on February 13 and 14, 1990. We base our opinion upon the findings of fact and conclusions of law hereinbelow.

## FINDINGS OF FACT

Claimant, Jesse James Bunch, is the owner of the defendant property located at the address designated hereinabove. He purchased it in 1972. (Ex. 1; Tr. 9 (stipulated fact); 232)[1] The property consists of a three story building; the first floor houses two commercial areas: a bar, known as "Bunch's Place" (the "bar"), and a video game arcade (the "arcade"). (S.F. 3(a)(ii); Tr. 7)[2] The second and third floors consist of residential apartments, including the apartment that Mr. and Mrs. Bunch occupied with their daughter and grandchildren from 1972 until the property was seized on October 21, 1988. (Id.) The property is located in an area that was, and continues to be, a highly active drug trafficking center. (Tr. 112, 207, 213–214, 227–228; Ex. B, 36)[3]

The bar was owned by Mr. Bunch; it was operated by Mr. and Mrs. Bunch and their daughter, Doreen, from 1972 until the property was seized. (S.F. 3(a)(iii); Tr. 11) The arcade was owned and operated by Stephanie Reed, who leased the area from Mr. Bunch. (S.F. 3(a)(iv); Tr. 253) The bar and the arcade were the only two establishments in the vicinity that were open late at night. (Tr. 185)

Various narcotics-related incidents occurred at the property, the first in 1976.

1985 — 22
1986 — 47
1987 — 50
1988 — 70
1989 — 58

through January 29, 1990 — 7. (Tr. 214; Ex. B, 36) These figures do not reflect arrest totals for the entire block that encompasses the property, nor do they include arrests made at the property itself. (Tr. 110, 113)

---

**1.** The letters "Ex." followed by a number indicate exhibits received in evidence at trial. The letters "Tr." followed by a number indicate pages of the official trial transcript.

**2.** The letters "S.F." followed by a number indicate references to the stipulated facts contained in the parties' joint pre-trial order.

**3.** In the one square block area to the east of the property, the number of drug-related arrests since 1985 are as follows:

On June 27, 1976, a bartender was arrested on narcotics charges while working inside the bar (S.F. 3(a)(v); Tr. 12, 14); it was the bartender's first arrest, after which Mr. Bunch terminated his employment at the bar. (Tr. 72, 126)

In January, 1977, a patron was arrested inside the bar on narcotics charges. (Tr. 15)

On April 26, 1977, another bartender was arrested while on duty inside the bar; two patrons were arrested at the same time. (S.F. 3(a)(vi); Tr. 15) The bartender received an adjournment in contemplation of dismissal; the other two individuals were convicted of seventh degree possession of a controlled substance. (Tr. 16) The arrest was the bartender's first; after his arrest, he was terminated from Mr. Bunch's employ. (Tr. 73, 126) The arrests of the bartender and the patrons were reported to the New York State Liquor Authority ("State Liquor Authority") by way of a police referral form. (Tr. 17–18; Ex. 23) The referral also made mention of the two previous arrests at the property. (Id.)

On January 10, 1980, a shooting occurred in a vehicle in front of the property. (Tr. 19, 74) It was one of "several" shootings to have taken place in the vicinity of the property over the past three to four years, including an incident where a Peekskill police officer was shot. (Tr. 74)

When the gun fire sounded, Mrs. Bunch locked the bar's front door for approximately ten minutes until the people who had congregated in the street dispersed. (Tr. 145) One person was killed; a second person, Charles Dabbs, who was shot during the incident, entered the bar twenty minutes after the shooting. (Tr. 143) Dabbs disposed in the bar's restroom a package containing a .38 caliber revolver and a quantity of marijuana. (S.F. 3(a)(vii); Tr. 20, 131; Ex. 27)

The police reported the incident to the State Liquor Authority; in the report, the police indicated that no employees of the bar provided any information regarding the investigation of the incident. (Ex. 27; Tr. 19–22) Mrs. Bunch testified before us that the police entered the bar twice that night, once before Dabbs entered and left the package in the restroom, and once after Dabbs left. (Tr. 131, 146) When the police entered the first time, the police asked Mrs. Bunch if anything had happened. (Id.) She responded that beyond hearing someone say that there was a shooting outside, she did not know anything because she did not go outside. (Id.) When the police entered after Dabbs left the package, they asked Mrs. Bunch if she had seen Charlie Dabbs. She told them that Dabbs came into the bar and went to the restroom; the police then went to the restroom and found the package. (Id.) Mrs. Bunch testified that the police made no statements to her when they retrieved the package from the restroom. (Tr. 147)

The property was free of incident from January, 1980, until January 5, 1987 (Tr. 19, 29–34) when Peekskill police, while executing a search warrant, arrested Jose Encarnacion, James Houston and Spencer Smythe in a third-story apartment at the property for possession of more than 200 vials of crack cocaine with intent to sell. (S.F. 3(a)(viii); Tr. 29–34; Ex. 2, 3, 4) Mr. Bunch was present when the arrests were made; he indicated to the police that had he been notified, he would have supplied the key so the police would not have had to knock down the apartment door. (Tr. 30–31)

Encarnacion was related to Mr. Bunch: the father of one of Bunch's grandchildren; Bunch's daughter Doreen is the child's mother. (Tr. 35, 137–38) Encarnacion, however, was not living with Doreen Bunch or the Bunch family; Doreen and the child lived with Mr. and Mrs. Bunch in one second floor apartment and Encarnacion lived in a separate third floor apartment. (Tr. 139; Ex. 2)

Encarnacion's arrest was his first; following the arrests, Mr. Bunch evicted Encarnacion and Smythe from their third floor apartments. (Tr. 32–34)[4] Additionally, Mr. Bunch voluntarily closed off the third floor and declined to rent the three

---

**4.** James Houston did not reside at the property.

apartments contained therein from February, 1987 until September, 1988, at a loss of $550 to $750 in monthly rental income. (Tr. 127–128, 240–241)

On January 6, 1987, an undercover Peekskill Police officer purchased a quantity of crack cocaine from an individual outside the property. (Tr. 37; Ex. 5) The individual met the officer on the street; she then entered the arcade and returned to the officer's car and completed the transaction. (Tr. 37–38)

On June 6, 1987 a patron was arrested in the bar's restroom for possession of cocaine. (S.F. 3(a)(ix); Tr. 40, 75; Ex. 6) Peekskill Police Detective McIntyre testified that the arresting officers observed numerous crack vials on the floor in the bar, and they advised Doreen Bunch, the bartender on duty, to take "corrective action" with regard to the open possession of crack cocaine in the bar by trying to screen the patrons as they came in the bar and by calling the police if she saw anyone possessing narcotics. (Tr. 44–45, 76; S.F. 3(a)(ix)) The officers did not speak with Mr. Bunch. (Tr. 45, 76) The police reported the incident to the State Liquor Authority, advising of "known trafficking in narcotics" at the bar. (S.F. 3(a)(ix); Ex. 24)

In the spring, 1987, Mr. Bunch became aware of drug activity in the vicinity of the property, and after July, 1987 he noted the appearance of increased drug activity within the property. (Tr. 240, 244, 256) Mr. and Mrs. Bunch testified that at that time they began to take measures to keep the drug activity out of the property. (Tr. 236, 121)

Mrs. Bunch testified that in 1987, when she began to smell "bad odors" coming from the restrooms, she would open the restroom door and spray ammonia on the floor to drive the smokers out. (Tr. 120–21, 149) If the people did not leave the restroom, Mrs. Bunch would call Mr. Bunch who would be at "the window upstairs, overlooking the streets" and tell him to call the police; she did not call the police from the bar because she feared that her safety would be threatened if the people in the restroom found out that she was reporting them. (Tr. 122, 133) Mr. Bunch

would call the person to the phone to ask him to stop whatever he was doing, and if that did not succeed, Bunch would personally go down and ask the person to leave. (Tr. 243) Mr. Bunch testified that he never had to call the police when those individuals did not leave, but he might have to call regarding drug "runners." (Tr. 243–44)

Mrs. Bunch testified that she recognized the people who had been in the restroom, but she did not know which of them had been smoking (Tr. 133, see 252); moreover, the police never asked her to identify anyone and she never volunteered the information. (Tr. 133–34) Mrs. Bunch also recognized the people in the bar to be the same people who were loitering on the street on a day-to-day basis, but she allowed them to enter the bar as long as they made a purchase and "as long as I didn't see them do [anything wrong]." (Tr. 135)

Mr. Bunch testified that in response to Mrs. Bunch's complaints that people were loitering and smoking in the restroom, he put a padlock on the restroom doors so that if anyone wanted to use the restroom, they would have to get the key from the bartender on duty. (Tr. 237) The padlock and key system failed because the key would break in the lock or get lost altogether, or people would leave the restroom door open so others could go in without having to get the key. (Tr. 238)

In the summer, 1987, the Bunches closed off the restrooms entirely by boarding up the doors so no one could gain entry to the restrooms. (Tr. 76, 123, 238) They reopened the restrooms (which were the only public restrooms in the area that people on the street could use (Tr. 242)) after the Department of Health notified them that closing up the restrooms "was against the rules and regulations." (Tr. 123; 76)

After they re-opened the restrooms, the Bunches installed an accordion-style partition that cut off a section of the bar. (Tr. 77) They also instituted a new system for monitoring the restrooms: if anyone had to use the restroom, he or she would have to get the bartender, usually Mrs. Bunch, to unlock the door; each person would then have one minute to use the restroom. (Tr.

124) Mrs. Bunch testified that as a result of installing the partition to cut off the back of the restaurant area and devising the "one person, one minute" restroom rule, she neither found crack vials nor smelled the odors coming from the restroom or the back of the bar after summer, 1987. She also discontinued the use of ammonia on the restroom floors because people no longer had the time to smoke in the restrooms. (Tr. 137, 140) Detective McIntyre testified that he continued to observe drug paraphernalia, including crack vials, scattered about the restroom, garbage and sink areas even after the Bunches took the preventative measures. (Tr. 102)

Mr. Bunch testified that during 1987 he called the police, anonymously, to give descriptions of people who were lurking around, possibly supplying drugs to runners, who in turn went to cars that waited in the street. (Tr. 236) He called anonymously because he was concerned about what might happen if he got involved. (Tr. 236)[5] Detective McIntyre testified that anonymous phone calls were made to the Peekskill police regarding the drug activity at and around the property. (Tr. 284–285)

In June, 1987, there was a drug-related double murder in the vicinity of but unrelated to the property. (Deposition of Peekskill Police Chief Edward Hayes, May 23, 1989, page 8, line 10; Tr. 212) After the homicide, police activity in the area increased; more patrolmen were assigned and increased lighting was installed in the area. (Tr. 89, 213) Police officers would walk into the bar more regularly, shine their flashlights into the corners, check the bathrooms, and leave. (Tr. 119) Additionally, a patrol car was parked nearby, and the police walked up and down the street and sometimes stood in front of the door to the bar or the arcade. (Tr. 129)

In the vicinity of the property there are many sources of pedestrian traffic. There is a housing project (Bohlmann Towers) directly across the street, a public park (LePore Park) a half-block east on the same

street, a teen recreation center approximately twenty-five feet away, and an elementary school nearby. (Tr. 129, 196, 227, 229) At certain times there was heavy pedestrian traffic in the area, and many people congregated in the vicinity of the property. (Tr. 201, 216, 229)

As a result of the increased police activity stemming from the June, 1987 shootings, many people who were loitering in the street would enter the bar to avoid interacting with the police. (Tr. 270) When people would enter the bar but not make a purchase, Mrs. Bunch would ask them to leave. (Tr. 135) She testified that the people would then mill about on the street, and the police would use the "loud speakers" (on the police cars) to tell the people to go into the bar and get off the street. (Id.) Consequently, she would let the people back in, and she decided that if the people were doing anything illegal the police would notice and take action because "the police [would] be right there, they [would] see [the same people] too." (Id.) Chief Hayes testified that while it was not department policy to give such instructions over the loud speakers, the technique "has been used." (Tr. 222)

On July 12, 1987, police officers observed a patron openly smoking a marijuana cigarette at the bar, but made no arrest. (Tr. 45; S.F. 3(a)(x)) Doreen Bunch, the bartender on duty at the time, took no action to stop the patron from smoking marijuana; the police advised her that the incident would be reported to the State Liquor Authority. (Id.) The police filed a referral with the State Liquor Authority, advising of known narcotics trafficking at the bar. (S.F. 3(a)(x); Ex. 25) Mr. Bunch did not recall if Doreen ever notified him of the incident prior to the State Liquor Authority's notification. (Tr. 261)

On September 13, 1987, a patron was arrested for disorderly conduct and resisting arrest. (Ex. 7) Detective McIntyre testified that the two arresting officers observed the patron "in possession of what

5. Peekskill Police Chief Hayes and Detective McIntyre testified that some drug dealers in the neighborhood could monitor police communications because they had police radio scanners. (Tr. 226, 285)

appeared to be a bag containing over 400 vials of crack cocaine" in the restroom area of the bar. (Tr. 48) A struggle ensued between the police and the patron, during which the bag allegedly containing the crack was thrown into the bar area; the police were not able to retrieve the bag. (Id.; Ex. 7)

On September 27, 1987, police officers, while responding to a report of an altercation at the bar, retrieved a pouch containing 16 vials of crack from the interior doorway area of the bar. (Tr. 49–54; S.F. 3(a)(xi); Ex. 8) The police advised Mrs. Bunch, the bartender on duty at the time, of what was found, "advised her to keep better control of her bar," but did not give her any instructions or directions regarding the conditions at the bar. (Ex. 8; Tr. 51) The police again filed a referral with the State Liquor Authority, advising of known narcotics trafficking at the bar. (S.F. 3(a)(xi); Ex. 26)

Mrs. Bunch testified that the police never told her outright of drug activity at the bar; rather, they told her there were "some cap[s] on the floor" and "to try to keep them off the floor" as much as possible. (Tr. 122–23) To further explain the presence of crack vials on the floor of the bar, Mr. Bunch testified that people would enter the bar, empty their pockets on the floor, and go back outside so they would not be caught with any illegal items if the police should stop them. (Tr. 270)

Although the police had submitted numerous referrals to the State Liquor Authority, the State Liquor Authority first contacted Mr. Bunch in December, 1987, regarding the charges that narcotics activity was taking place at the bar (Tr. 233); he met with a State Liquor Authority investigator on February 8, 1988, to discuss those charges. (Id.)[6]

After his meeting with the State Liquor Authority investigator, Mr. Bunch wrote a letter to the State Liquor Authority on February 19, 1988, advising of the steps he would take to curtail narcotics activity at the bar (Ex. 29; Tr. 278): that he installed

a "beeper," or electromagnetic lock, on the front door to monitor patrons coming into the bar; that he was personally supervising the premises at times that he usually had not; that he restricted the operating hours by opening at 5:00 p.m. instead of 10:00 a.m.; and that he wrote a letter to Chief Hayes asking that the police "correct the situation they [were] causing at [the property]." (Tr. 252; Ex. A) Mr. Bunch also asked the State Liquor Authority for any additional suggestions (Id.); no testimony was offered that the State Liquor Authority made any suggestions to Mr. Bunch in response to his letter.

With respect to the corrective measures Mr. Bunch claims to have taken, both Mr. and Mrs. Bunch testified that the electromagnetic lock was a "nuisance" and was used rarely, if at all. (Tr. 125, 252–53, 269, 275–76; Deposition of Jesse James Bunch, May 22, 1989, 71–72) Detective McIntyre testified that due to the installation of the magnetic lock, entry into the bar by the police was delayed on a number of occasions, and upon entry there was a strong smell of raw ammonia on the bar floor, powerful enough to mask the odor of crack (Tr. 65–66, 103); *however, he never observed anyone in possession of or smoking any illegal drugs during any of his hundreds of inspections of the property.* (Tr. 64, 100) Mrs. Bunch testified that she never kept the police from coming into the bar, and that the smell of ammonia was not that overwhelming in the bar area because the restroom door would be closed once the people left the restroom. (Tr. 130, 150)

With respect to his personal supervision of the "premises," Mr. Bunch testified that he would "monitor" the area outside the bar and arcade from his position at an upstairs window. (Tr. 257) He was also available to make any "out of the ordinary" decisions and to address any patrons who may be causing trouble. (Tr. 273–74, 122)

With respect to the shorter operating hours, Mrs. Bunch testified that when she became the sole bartender after 1986, she would open at 5:00 or 6:00 p.m., and she

---

6. The State Liquor Authority contacted Mr. Bunch on one other occasion on a charge of selling liquor to a minor; however, the charge was dismissed. (Tr. 272–74)

would sometimes close the bar as early as 12:00 a.m. although usually at 1:30 a.m. (Tr. 119–120)

In his letter to Chief Hayes, Mr. Bunch advised of the situation at the bar, namely, that the increased police patrols in the vicinity were "chasing people" into the bar "including drug users and dealers," and Mr. Bunch asked the Chief to "cooperate with me and not have his officers do that." (Ex. A; Tr. 234) Chief Hayes testified that he received the letter and while he "may have" spoken to Mr. Bunch in reference to it, he "believed" that he did not respond to Mr. Bunch's letter. (Tr. 210)

As a further step to curtail drug activity at the property, in March, 1988, Mr. Bunch posted metal signs near the entrances to the arcade and bar, as well as inside the bar area: "WHEN YOU ENTER THIS PROPERTY YOU ARE SUBJECT TO SEARCH AND PHOTO." (Tr. 82–84, 242; Ex. M) Mr. and Mrs. Bunch testified that they did not search or photograph any persons, but Mr. Bunch testified, "I thought I was frightening people by telling them they would be subject to search or they could be photographed at any time. If they were going to do something wrong, they wouldn't do it within my premises." (Tr. 243)

Despite Mr. Bunch's attempts to curtail drug activity at the property, those activities continued. On March 23, 1988, James Burnett, an employee of the leased arcade, was arrested in the arcade and charged with possession of over 40 vials of crack. (Tr. 55; Ex. 9) Burnett was neither a business associate of Mr. Bunch nor were they ever related in any other respect. (Tr. 96)

Weston Reed, another employee of the arcade and brother of the lessee (Tr. 56), was arrested several times in the vicinity of the property for narcotics related offenses and was known by law enforcement officials as a drug dealer. (Tr. 61–62) Burnett's and Reed's narcotics activities were the target of a DEA investigation that began in July or August, 1988, in the vicinity of the property. (Tr. 185, 198) The property came within the scope of the investigation due to its proximity to Burnett's and

Reed's operation. (Tr. 205) Agent Fletcher testified that the DEA arranged drug transactions with Burnett at the property in an attempt "to move up the ladder and get not only Mr. Burnett but a number of other defendants" from "Mr. Burnett and Weston Reed's organization ... in the vicinity of [the property]." (Tr. 205)

In the course of their investigation of Burnett and Reed, police and DEA agents established surveillance of the property. Through exterior surveillance of the property police noticed known narcotic offenders going "in and out of the bar in a very short time frame, which was not consistent with persons going in to a bar to have a drink, or to sit down," and that "persons involved in the use of narcotics, were frequently observed going in and out of the [arcade]." (Tr. 67) Detective McIntyre testified that there were curtains or shades in the windows of the arcade and "they were drawn to avoid people being able to see in or out of the windows." (Tr. 68) There is no evidence that the police told Mr. Bunch of the investigation or the results thereof, or that they asked for his cooperation in conducting the investigation.

Detective McIntyre testified that when Burnett was arrested on March 23, 1988, a Peekskill police officer advised Mr. Bunch that the arcade was a front for narcotics activity. (Tr. 56) However, Mr. Bunch denied being present at the property that day, and he testified that he did not learn of Burnett's arrest at the arcade until October 21, 1988, when the property was seized. (Tr. 254) The police report of Burnett's arrest did not mention the alleged conversation between the officer and Mr. Bunch. (Ex. 9)

With regard to possible drug activity at the arcade, Mr. Bunch testified that he talked once to Ms. Reed, the lessee, about "running a clean place" and that if she was arrested for drug activity "she would break her lease." (Tr. 257) Mr. Bunch had previously testified that he and Ms. Reed spoke often, and he felt that if anyone was doing anything wrong in the arcade, "the police would get them" because after the June, 1987, shooting the "police [were] standing

right outside the door" of the arcade. (Deposition of Jesse James Bunch, May 22, 1989, 78; Tr. 255–57, 258) Mr. Bunch felt that by having the arcade open "it would take some pressure off the bar" because fewer people would loiter in and around the front of the bar. (Tr. 258–59)

On July 29 and 31, 1988, an undercover detective negotiated with a narcotics dealer for the purchase of crack at the property (Tr. 159; Ex. 10, 11); on both occasions no sale took place. (Tr. 161)

On August 3, 1988, the same detective purchased 98 vials of crack at the property. (Tr. 165; Ex. 12, 13) The detective purchased the crack from an individual named "Demar" who informed the detective that future narcotics transactions would have to take place somewhere other than at the property because of increased police surveillance, due in large part to a shooting in the vicinity in June, 1987, and because Demar was not a well-liked drug dealer in the vicinity. (Tr. 208)

On September 15, 1988, the same undercover detective observed an individual conducting three separate drug sales, all in the arcade, by exchanging crack for money with different persons (Tr. 175; Ex. 18); no arrests were made. (Ex. 18)

In September and October, 1988, James Burnett was involved in several narcotics transactions at the property with confidential informants which were arranged by the DEA.[7] On September 1, a confidential informant entered the arcade and received free samples of cocaine and crack from Burnett. (Tr. 170; Ex. 16, 21) On September 16, a confidential informant entered the bar and purchased 24 vials of crack from Burnett. (Tr. 178; Ex. 19) On September 23, a confidential informant again entered the bar and purchased 80 vials of crack from Burnett. (Tr. 179; Ex. 20) On October 7, Burnett sold 112 vials of crack to a confidential informant inside the arcade. (Tr. 181; Ex. 22)

On October 21, 1988, Burnett was arrested on narcotics-related charges. (Tr. 184)

Burnett was subsequently convicted thereon in federal court and sentenced to prison. (Tr. 60–61) He was also convicted in state court and received a sentence there as well. (Id.)

Also on October 21, 1988, the government seized the property. (S.F. 3(a)(xiii)) Mr. Bunch testified that he did not know whether empty crack vials and a quantity of crack were recovered from the tenants' apartments (Tr. 271), nor did he know whether empty crack vials and a full vial of crack cocaine were recovered from behind the bar during the search of the property by law enforcement officers, as Detective McIntyre had testified. (Tr. 271, 71) In addition, several individuals were arrested on narcotics charges in conjunction with the seizure. (Tr. 69)

There is still high drug activity in the vicinity of the property. (Tr. 112, 207, 213–214, 227–228; Ex. 36) Police have observed drug dealers and drug activities in Lepore Park. (Tr. 196–198) Peekskill Housing Authority Executive Director William Edward Shands testified that there is drug activity in Bohlmann Towers; as a result, the Housing Authority has increased security forces and tenant patrols (Tr. 227–28), and 23 residents had been evicted from 1985 through February, 1990, for narcotics trafficking in their residences. (Tr. 229) Peekskill Police Chief Hayes testified that the bulk of arrests in Peekskill in 1987 and 1988 took place in the Bohlmann Towers–Lepore Park area. (Tr. 217) The Lepore Park and Bohlmann Towers vicinity is still a problem area for drugs (Tr. 215, 230); however, Detective McIntyre testified that narcotics activity in the area has "substantially decreased and moved to various areas throughout the city." (Tr. 90, 112) He also testified that the approximate total number of drug arrests in Peekskill for 1988 was 600, and for 1989 the approximate total was in the 200's. (Tr. 104; Ex. 36) Chief Hayes testified that the decrease in arrests made in the vicinity of the property in 1989 following the seizure of the property may

7. Burnett also was involved in at least two other transactions "in the vicinity" of the property.

(Tr. 172, 174–75; Ex. 14, 17, 15)

be attributed to the relocation of drug dealers (Tr. 220), but that the seizure of the property resulted in fewer narcotics-related arrests in Peekskill. (Tr. 221)

## CONCLUSIONS OF LAW

The statute governing this action, 21 U.S.C. § 881(a)(7) (1988), provides for the forfeiture of

[a]ll real property, including any right, title, and interest (including any leasehold interest)' in the whole of any lot or tract of land and any appurtenances or improvements, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this subchapter punishable by more than one year's imprisonment, except that no property shall be forfeited under this paragraph, to the extent of an interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.

*Probable Cause*

■ Under 21 U.S.C. § 881, civil forfeiture proceedings are governed by the "law relating to the seizure, summary and judicial forfeiture, and condemnation of property for violation of the customs laws." 21 U.S.C. § 881(d) (1988). *See, United States v. All Right, Title & Interest in Real Property & Building Known As 303 West 116th Street, New York, New York*, 901 F.2d 288, 290 (2d Cir.1990); *United States v. $2,500 In United States Currency*, 689 F.2d 10, 12 (2d Cir.1982), *cert. denied sub nom. Aponte v. United States*, 465 U.S. 1099, 104 S.Ct. 1591, 80 L.Ed.2d 123, *reh'g denied*, 466 U.S. 994, 104 S.Ct. 2376, 80 L.Ed.2d 848 (1984). Under that law the "burden is initially on the government to establish its right to forfeiture by demonstrating probable cause" that the subject property was used in violation of 21 U.S.C. § 881. *United States v. One Parcel of Property Located at 15 Black Ledge Drive, Marlborough, Connecticut*, 897 F.2d 97, 101 (2d Cir.1990). *See also United States v. Premises and Real Property at 4492 South Livonia Road, Livonia, New York*, 889 F.2d 1258, 1267 (2d Cir.1989); *United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1160 (2d Cir.1986). In order to meet its burden of showing probable cause, "the government must have reasonable grounds to believe that certain property is subject to forfeiture. These grounds must rise above the level of mere suspicion but need not amount to what has been termed 'prima facie proof.'" *303 West 116th Street*, 901 F.2d at 291 (quoting *Banco Cafetero Panama*, 797 F.2d at 1160).

■ The government may show probable cause on the basis of whatever evidence traditionally establishes probable cause, including hearsay. *See 4492 South Livonia Road*, 889 F.2d at 1267; *United States v. Parcel of Real Property Known As 6109 Grubb Road*, 886 F.2d 618 (3d Cir.), *reh'g denied*, 890 F.2d 659 (3d Cir.1989) "The question of probable cause depends not upon the admissibility of the evidence upon which the government relies but only upon the legal sufficiency and reliability of the evidence." *United States v. One 56–Foot Motor Yacht Named Tahuna*, 702 F.2d 1276, 1283 (9th Cir.1983). "'The determination of probable cause in a forfeiture proceeding simply involves the question of whether the information relied on by the government is adequate and sufficiently reliable to warrant the belief by a reasonable person that' the property was used to further the trafficking of illegal narcotics." *6109 Grubb Road*, 886 F.2d 618, 621 (quoting *Tahuna,* 702 F.2d 1276, 1283 (9th Cir. 1983)).

■ Hearsay evidence is not admissible on the merits of the case, but only for purposes of determining the preliminary probable cause issue. *6109 Grubb Road*, 886 F.2d at 622. Therefore, hearsay evidence can not be admitted to rebut claimant's "innocent owner" defense. *Id.* Indeed, at trial we ruled that the government's hearsay evidence would be admissible solely on the issue of probable cause. (Tr. 101)

■ Claimant, Jesse James Bunch, mistakenly relying on *United States v. All Those Certain Lots in Virginia Beach,*

657 F.Supp. 1062 (E.D.Va.1987), argues that in order to establish probable cause, the government must show a "substantial connection" between the illegal narcotics activities and the property. (Memorandum of Law on Behalf of Claimant, Jesse James Bunch, 16–17) Claimant also argues that the government has not met its burden for establishing probable cause because the government did not prove, or even allege, that Mr. Bunch himself was involved in illegal drug activity. (Id. at 16) We do not agree.

■ Our Circuit Court has held that in order to meet its burden of establishing probable cause, the government need not establish a "substantial connection" between the criminal activity and the property; the government need only show a "sufficient nexus". *4492 South Livonia Road,* 889 F.2d 1258, 1269 (citing *United States v. One 1974 Cadillac Eldorado,* 575 F.2d 344, 345 (2d Cir.1978); and *United States v. One 1974 Cadillac Eldorado Sedan,* 548 F.2d 421, 423 (2d Cir.1977)). "Similarly, we have required the government only to show 'probable cause to connect the property with narcotics activity,' although the government 'need not link the property to a particular transaction.'" *4492 South Livonia Road,* 889 F.2d at 1269 (quoting *Banco Cafetero Panama,* 797 F.2d at 1160). *See also United States v. One 1986 Mercedes Benz,* 846 F.2d 2, 4–5 (2d Cir.1988) (per curiam) (forfeiture may be predicated on a minute quantity of drugs). Furthermore, the government need only establish the requisite relationship between the property and the illegal drug activity, regardless of the activities of the property owner. *United States v. All Right, Title And Interest in Real Property And A Building Known As 16 Clinton Street, New York, New York,* 730 F.Supp. 1265, 1267 (S.D.N.Y. 1990) (citing *Banco Cafetero Panama,* 797 F.2d 1154, 1160; and *303 West 116th Street,* 710 F.Supp. 502, 505 (S.D.N.Y. 1989), *aff'd,* 901 F.2d 288 (2d Cir.1990).

Moreover, if in order to show probable cause the government has to show in each instance that the property owner was involved with the illegal activity, then the government would have to establish the claimant's knowledge and consent; therefore, under claimant's interpretation of the statute no property owner would be able to invoke § 881(a)(7)'s "innocent owner" defense because knowledge and consent would already have been established by the government. That result would be inconsistent with the statute, which shifts the burden of persuasion to the claimant, once probable cause is established, to show by a preponderance of the evidence that he lacked of knowledge of or consent to the illegal drug activity.[8] Thus, the government did not need to establish a connection between Mr. Bunch and the illegal activities, it merely had to establish a "sufficient nexus" between the *property* and the *illegal narcotics activities.* *16 Clinton Street,* 730 F.Supp. at 1267; *4492 South Livonia Road,* 889 F.2d at 1269.

We find that the government introduced ample evidence to establish a "sufficient nexus" between the property and illegal narcotics activity; thus the evidence was sufficient to establish probable cause that the property was subject to forfeiture under 21 U.S.C. § 881(a)(7). This evidence included claimant's stipulation to the fact that he was aware of drug activity at the property as of the Spring, 1987, and that he was aware of increased drug activity at the property after July, 1987. There were also specific instances of narcotics-related activity at the property: the record established that James Burnett was arrested in the arcade on one occasion, and he conducted at least four other narcotics transactions at the property with confidential informants; Peekskill police officers reported that on numerous occasions they observed crack vials on the floor in the restaurant and restroom areas of the bar; and an undercover detective observed as an individual conducted three crack sales within one

---

**8.** A more detailed discussion of the claimant's burden will appear in the discussion of the "innocent owner" defense, *infra.*

twenty-minute period on September 15, 1988.

■ Claimant contends, however, that the government still failed to establish probable cause because it did not show that any violation of the Drug Abuse Prevention and Control Act, 21 U.S.C. §§ 801 et seq., occurred at the property. (Memorandum of Law on Behalf of Claimant, Jesse James Bunch, 18) Relying on language in § 881(a)(7) that makes property subject to seizure if it is used, or intended to be used, to commit "a violation of this subchapter punishable by more than one year's imprisonment," claimant argues that all of the criminal conduct proven by the government at trial was "at most a violation of the laws of the State of New York" (Id.); thus, § 881(a)(7) does not apply and the property should not be subject to forfeiture. For the reasons stated below, we disagree with claimant's contention.

Our Circuit Court has recently reiterated that "civil forfeiture under 21 U.S.C. § 881 need not be predicated on a federal criminal proceeding." *303 West 116th Street*, 901 F.2d 288, 292 (2d Cir.1990). The Court further noted that

> The language of section 881(a)(7) does not require a conviction under the federal narcotics laws as a basis for forfeiture. Rather, any property used to facilitate conduct which would violate chapter 13 ... of Title 21 [the Drug Abuse Prevention and Control Act, 21 U.S.C. §§ 801 et seq., (1988)], regardless of whether that conduct results in a federal conviction, is subject to forfeiture. "[T]he term 'violation' does not imply a criminal conviction. It refers only to a failure to adhere to legal requirements."

*Id.* at 292–3 (quoting *S.P.R.L. v. Imrex Co., Inc., et al.*, 473 U.S. 479, 489, 105 S.Ct. 3275, 3281, 87 L.Ed.2d 346 (1985)).

21 U.S.C. § 841(a) provides, in pertinent part, "it shall be unlawful for any person knowingly or intentionally—(1) to manufacture, distribute, or dispense, or possess ... a controlled substance...." 21 U.S.C. § 841(b)(1)(C) provides that a violation of § 841(a) carries with it a term of imprisonment of not more than 20 years if the violation involves a controlled substance that is listed in Schedule II. 21 U.S.C. § 812(c) lists cocaine and its various derivatives as Schedule II controlled substances. Since cocaine and crack cocaine are Schedule II controlled substances, any violation of § 841(a) involving cocaine or crack would be punishable by more than one year's imprisonment. Therefore, any conduct involving cocaine or crack that would violate § 841(a) would subject the property to forfeiture under § 881(a)(7).

The government offered considerable evidence of activity violative of 21 U.S.C. § 841(a). Here, as in the discussion above, the evidence regarding James Burnett's March 23, 1988 arrest at the arcade, as well as evidence that he gave or sold crack to confidential informants on at least four separate occasions at the property, would be sufficient to establish that the property was used in violation of § 841(a)(1). The government introduced other evidence as well, including an undercover detective's observation of an individual who made three separate drug transactions in one evening in the arcade, and the sale of crack to undercover police by "Demar" in the arcade.

Based on the totality of the evidence presented by the government, we find that there were reasonable grounds to believe that the property was being used in violation of Title 21; therefore, the government met its burden and established probable cause that the property is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(7).

*The "Innocent Owner" Defense*

■ Once the government establishes probable cause that the property is subject to forfeiture, the claimant then bears the "ultimate burden of proving that the factual predicates for forfeiture have not been met." *303 West 116th Street*, 901 F.2d 288, 291 (quoting *Banco Cafetero Panama*, 797 F.2d at 1160). Claimant may accomplish this by demonstrating that either the property was not used for an unlawful purpose, or that the illegal use was without claimant's knowledge or consent. *303 West 116th Street*, 901 F.2d 288, 291. *See also 4492 Livonia Road*, 889

F.2d 1258, 1267. This latter defense is known as the "innocent owner" exception and is a statutorily created exception to forfeiture under § 881(a)(7). *Id.* This exception provides, in pertinent part, that "no property shall be forfeited under this paragraph, to the extent of an interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge *or* consent of that owner." 21 U.S.C. § 881(a)(7) (emphasis added).

In the present case, claimant could not challenge the government's showing that the property was used for an unlawful purpose. We have already listed in detail the various narcotics transactions that occurred at the property, to wit: the narcotics activities of James Burnett, the purchases made by undercover detectives and confidential informants at the property; police observations of drug transactions in the arcade; and police observations of crack vials on the floor and in the restroom of the bar.

■ However, claimant asserts the "innocent owner" exception that is set out in § 881(a)(7). In particular, he claims that any narcotics activity that may have occurred at the property did so without his knowledge or consent. We will undertake to discuss each separate element below; first, however, we must answer a threshold question: in order to successfully invoke the "innocent owner" exception found in § 881(a)(7), must claimant prove both lack of knowledge and lack of consent, or can the defense survive if only one of the two elements is proven?

Our research has revealed four other published opinions in which a federal court has examined the "knowledge or consent" language in § 881(a)(7) to determine whether they establish separate and independent defenses. In *United States v. Certain Real Property & Premises Known As 171-02 Liberty Avenue, Queens, New York,* 710 F.Supp. 46 (E.D.N.Y.1989), the defendant property was located in a high drug-trafficking area. The property owner knew that the property was being used as a base to sell crack cocaine. The govern-

ment argued that the owner's knowledge of the illegal activity was sufficient to defeat the innocent owner defense. The owner argued that since the innocent owner defense in the statute applied to one who could show lack of "knowledge or consent," he would be able to establish the defense if he could show that he did not consent to the illegal activity at the defendant property. 710 F.Supp. at 48–49.

The district court for the Eastern District of New York agreed with the claimant and held that even if an owner has knowledge that his property has been used illegally, he may still prove innocent ownership by showing his lack of consent to the illegal use. In so ruling, the court reasoned that

> [u]nder normal canons of statutory construction, the court must give effect to Congress' use of the word "or" by reading the terms "knowledge" and "consent" disjunctively. *See Reiter v. Sonotone Corp.,* 442 U.S. 330, 338–39, 99 S.Ct. 2326, 2330–31, 60 L.Ed.2d 931 (1979) (court cannot ignore the disjunctive "or" so as to rob the nouns it separates of their *"independent* and ordinary significance"; emphasis added); *FCC v. Pacifica Foundation,* 438 U.S. 726, 739–40, 98 S.Ct. 3026, 3035–36, 57 L.Ed.2d 1073 (1978) (terms connected by a disjunctive must be given separate meanings).

*Id.* at 50. *Accord, 6109 Grubb Road,* 886 F.2d 618, 626–27 (3d Cir.1989). *Cf. United States v. Certain Real Property And Premises Known As 418 57th Street, Brooklyn, New York,* 737 F.Supp. 749, 750 (E.D.N.Y.1990) ("[t]he statute ... should only be interpreted to mean that the property shall be forfeited unless the wrong occurred without either the knowledge or the consent of the owner."). *But see United States v. Certain Real Property and Premises Known as 890 Noyac Road, Noyac, New York,* 739 F.Supp. 111 (E.D.N.Y. 1990) (the phrase should be construed as "without knowledge *and without consent*"); *United States v. Premises Known as 1908–1910 Jackson Street, Philadelphia, PA.,* 1987 WL 13086, 13090 (E.D.Pa. 1987) (to withstand summary judgment,

claimants must show that they "had no knowledge nor gave their consent.").

In *6109 Grubb Road*, 886 F.2d 618 (3d Cir.1989), the Third Circuit Court of Appeals was faced with a situation where a husband and wife owned two parcels of real estate on which the husband conducted narcotics activities. The husband was convicted of various narcotics offenses, making the properties subject to forfeiture pursuant to 21 U.S.C. § 881(a)(7). The district court for the Western District of Pennsylvania entered an order forfeiting the parties' interests in the two parcels of land. In so doing, the court determined that the wife had not satisfied her burden of showing innocent ownership because she failed to prove lack of knowledge, even though her lack of consent defense was still available. 886 F.2d 618, 620–21, 626.

The circuit court construed the language of § 881(a)(7) "keeping in mind the congressional purpose in enacting forfeiture statutes and that Congress does not generally place language in a statute without purpose." *Id.* at 625 (citing *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338–39, 99 S.Ct. 2326, 2330–31, 60 L.Ed.2d 931 (1979)). The circuit court, in vacating the district court's decision, agreed with the reasoning set forth in *171–02 Liberty Avenue*, and held that the canons of statutory construction require that the statute be interpreted to provide that "an owner or an individual with an interest in real property can avoid forfeiture by proving by a preponderance of the evidence that the illegal act or omission was committed or omitted either without his knowledge or without his consent." *Id.* at 620.

In *United States v. Sixty (60) Acres, More Or Less With Improvements, Located in Etowah County, Alabama,* 727 F.Supp. 1414, *order vacated,* 736 F.Supp. 1579 (N.D.Ala.1990), the district court for the Northern District of Alabama was presented with a similar situation as that in *6109 Grubb Road.* The husband was using the property to facilitate drug transactions, and the wife, although she knew of the activities, claimed that she did not consent. 727 F.Supp. at 1415–16. In resolving the

issue of whether the wife could establish her innocent owner status, the court relied on the reasoning in *171–02 Liberty Avenue* and *6109 Grubb Road* and determined that even if the wife knew of the illegal activity, she could still establish her innocent ownership if she could "prove by a preponderance of the evidence an absence of 'consent' to her husband's illegal activities." *Id.* at 1419.

By reading "knowledge or consent" in accordance with the canons of statutory construction, we agree with the courts in *171–02 Liberty Avenue, 6109 Grubb Road,* and *Sixty (60) Acres,* and we find that the innocent owner defense found in 21 U.S.C § 881(a)(7) creates three classes of owners: 1) those who did not know of any illegal activity, who therefore could not consent to any such activity because lack of knowledge implies lack of consent; 2) those who did know of illegal activity who also consented; and 3) those who did know of illegal activity at the property but who did not consent to its occurrence. Knowledge of the narcotics violations should not be equated to consent. *6109 Grubb Road,* 886 F.2d at 626. Thus, we conclude that Jesse Bunch can show innocent ownership if he can prove, by a preponderance of the evidence, that the illegal narcotics activity occurred at the property without his knowledge or without his consent. *Id.; 171–02 Liberty Avenue,* 710 F.Supp. at 50; *Sixty (60) Acres,* 727 F.Supp. at 1419.

*Lack of Knowledge as a Defense*

If there is proof that the property was used to facilitate felony narcotics violations of Title 21, the property must be forfeited unless the claimant can establish by a preponderance of the evidence that "any act or omission" occurred without his knowledge or consent. 21 U.S.C. § 881(a)(7) (1988). *See 4492 Livonia Road,* 889 F.2d at 1267. The government need not show that the claimant had actual knowledge; rather, the burden is on the claimant to prove the absence of actual knowledge. *United States v. Four Million, Two Hundred Fifty–Five Thousand, etc.,* 762 F.2d 895 (1985), *cert. denied,* 474

U.S. 1056, 106 S.Ct. 795, 88 L.Ed.2d 772 (1986).

■ Claimant argues that he did not have actual knowledge of any illegal activity; at most, he maintains that he had constructive knowledge. He testified that he was not made aware of James Burnett's March 23, 1988, arrest until October, 1988, when the property was seized. He also testified that his wife and daughter did not notify him when the police advised them that evidence of drug activity and drug trafficking was found (Tr. 264–65, 274); and that he was not told directly by the police that any illegal activity was occurring at the property. Chief Hayes testified that he had "no knowledge" of whether any member of the Peekskill police department ever told Mr. Bunch of narcotics activity at the property. (Tr. 218)

However, the government offered sufficient evidence to rebut claimant's assertion that he did not have actual knowledge of drug activity at the property. He stipulated that he became aware of marijuana usage at the property in 1986, that he had knowledge of drug activity in the spring of 1987 due to the presence of drug vial caps in the restrooms, and that he was aware that drug activity at the property increased after July, 1987. He also was notified by the New York State Liquor Authority in December, 1987, that the police were lodging complaints regarding suspected drug trafficking at the bar and that he "should try to control it." (Tr. 233) In addition, Mr. Bunch was present at the property when Jose Encarnacion and two others were arrested on narcotics charges in the third floor apartment in January, 1987.

Based on the evidence adduced at trial that is admissible on this issue, we are compelled to conclude that claimant failed to meet his burden of proving by a preponderance of the evidence that he lacked knowledge of the illegal narcotics activity occurring at his property.

*Lack of Consent as a Defense*

■ In order to avoid forfeiture under the statutory innocent owner defense of 21 U.S.C. § 881(a)(7), claimant need only prove by a preponderance of the evidence that the illegal acts were committed without his knowledge or consent. *United States v. Lots 12, 13, 14, 15, Keeton Heights Subdivision, Morgan County, Kentucky,* 869 F.2d 942, 947 (6th Cir.1989); *6109 Grubb Road,* 886 F.2d 618, 620. The statutory "innocent owner" defense of § 881(a)(7), unlike the constitutional defense found in *Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 689, 94 S.Ct. 2080, 2094, 40 L.Ed.2d 452 (1974), does not require claimant to prove that he has done all he could reasonably be expected to do to prevent the proscribed use of his property in order to establish lack of consent. *Lots 12, 13, 14, 15,* 869 F.2d at 947; *171–02 Liberty Avenue,* 710 F.Supp. 46; *United States v. Certain Real Property,* 724 F.Supp. 908 (S.D.Fla.1989). Despite the lack of a requirement that the owner prove he had done all that was reasonably necessary to prevent the proscribed use of his property, it has been suggested that in order to prove that he did not consent to the illegal activity, the owner must show that he at least did something affirmative to stop the proscribed use of his property. *See, Sixty (60) Acres,* 727 F.Supp. at 1420–21. *See also 171–02 Liberty Avenue,* 710 F.Supp. at 50–52.

■ We find that claimant succeeded in bringing forward evidence sufficient to establish his lack of consent to the illegal activities occurring at his bar. Mr. Bunch fired two bartenders following their arrests at the bar. He evicted Jose Encarnacion and Spencer Smythe and closed off their third floor apartments following their arrests for narcotics offenses at the property; consequently, Mr. Bunch lost rental income of $550 to $750 per month by keeping those rooms vacant from January, 1987, to September, 1988.

Mr. Bunch also took several steps to curtail the narcotics trafficking in the restaurant and restroom areas of the bar in response to the increased drug activity in the area. He tried at first to use a lock and key system in an attempt to restrict access to the restroom; then he boarded up the restrooms completely. He reopened the restrooms only after the Health De-

partment advised him that he was required to keep them open. At that point, Mr. Bunch closed off the back hall of the restaurant area completely so that anyone who wanted to use the restroom would have to see the bartender; and he instituted a "one person for one minute" rule for using the restroom whereby the bartender would oversee the use of the restrooms.

Furthermore, Bunch installed an electromagnetic lock on the entrance door and signs were posted at the entrance and inside the bar advising that, "WHEN YOU ENTER THIS PROPERTY YOU ARE SUBJECT TO SEARCH AND SEIZURE." (Tr. 82–84)

When Mr. Bunch was notified by the State Liquor Authority of the narcotics trafficking at his bar, he placed a restriction on the hours of operation of the bar and he "monitored" the bar and arcade from his position at a second floor window. Mr. Bunch also wrote a letter to Chief Hayes wherein he advised Chief Hayes that the police were chasing people into the bar by their presence, and he asked for assistance in addressing the drug problem in the vicinity of the property. There was no evidence introduced at trial that suggests that the police asked for Bunch's cooperation in the investigation in the area, nor did they respond to his request for assistance.

Mr. Bunch also placed anonymous phone calls to report the drug activity in the vicinity of the property.

The government established that individuals suspected of being involved in drug activity were allowed to enter the bar, and Mr. Bunch testified that he saw certain suspicious individuals enter the arcade. However, Mr. and Mrs. Bunch allowed some of those suspicious people to enter the bar as long as they did not do anything illegal, and they allowed others in because the people were being "chased" into the bar by the increased police activity. Additionally, Mr. Bunch had little concern that illegal narcotics activity was occurring in the arcade because police officers would regularly stand outside the arcade's front door.

We are not disposed to comment on the success or failure of the corrective measures taken by claimant, nor can we state what claimant could have or should have done to eradicate the narcotics blight from his property. The police authorities did not have many suggestions for Mr. Bunch either.

We are not unmindful of the difficult task that law enforcement agencies face in combatting the spread of drugs. The government's evidence was indeed impressive; what prevails, however, is that, given his personal strength and limitation, claimant introduced sufficient credible evidence to convince us he did not consent to any narcotics activities that occurred at the premises.

It should be made emphatic that the total trial record offered by Mr. Bunch barely meets the law's imperative demand for acceptability.

## CONCLUSION

On the total trial record and the law applicable thereto, we reach the conclusion that Claimant did know of illegal activity at the property but did not consent to its occurrence. Therefore, we find in favor of the claimant, Jesse James Bunch, on the grounds that he has sustained his burden of proving "innocent ownership"; thus he has overcome the government's forfeiture claim. Consequently, we are constrained to, and do, dismiss the government's complaint and order the property returned to Jesse James Bunch.

SO ORDERED.